[No. 21939. Department One. November 12, 1929.]

CARL E. WILBUR, *Respondent*, v. GARFIELD TAYLOR et al., *Appellants*.[1]

F. L. *Morgan* and *Chas. R. Lewis,* for appellants.

*Williamson, Freeman & Broenkow* and *Troy & Yantis,* for respondent.

TOLMAN, J.—This is an action to recover upon a promissory note for the sum of $1,000, the execution of which was admitted. Special defenses were presented, and at the close of the defendants' evidence, the trial court directed a verdict in favor of the plaintiff for the full amount demanded. From a judgment on the directed verdict, the defendants have appealed.

It appears that, on December 1, 1924, the parties to this action entered into a written contract, which we here quote:

"AGREEMENT

"THIS AGREEMENT made and entered into this 1st day of December, A. D. 1924, by and between CARL E. WILBUR and GERTRUDE WILBUR his wife, of Tacoma, Washington, hereinafter called the 'OWNERS'; and GARFIELD TAYLOR a widower and B. N. TAYLOR and NELLIE TAYLOR, husband and wife, all of Shelton, Washington, hereinafter called the 'BUYERS':—

"WITNESSETH:—

"(1) That the 'OWNERS' for and in consideration of the payments to be made as hereinafter provided, and the faithful performance by the 'BUYERS' of each and all of the covenants and agreements contained herein, including the covenants as to payment, hereby sell and convey unto said 'BUYERS' all the marketable timber, whether standing or down and now in or upon the following described premises situate in Lewis county, state of Washington, to wit: [description omitted]

"AND FOR SAID CONSIDERATIONS hereby gives and grants unto said 'BUYERS' upon and in accordance with the conditions hereinafter named as to time and manner of enjoying the right to enter and come upon said lands and each and every part thereof, with all necessary and convenient men, engines, tools and equipment whatsoever, to cut, log, mill and remove said timber in the manner customary in logging and milling operations in Western Washington.

"(2) THE 'BUYERS' covenant and agree to cut, log, mill and remove all of said timber from said land in the manner and time following:

"(a) All timber standing or down, 24 feet or over in length having tops of ten and one-half (10½) inches or better;

"(b) A minimum of not less than 1,000,000 feet, mill scale of lumber shall be cut each year.

"(c) Date of commencement of operations under this agreement shall be April 1, 1925.

"(d) The 'BUYERS' shall have three months of each year shut down privilege; but such privilege does not affect the minimum cut of timber to be made each year as provided in this paragraph under clause (b).

"(3) IT IS AGREED between the parties to this agreement that for the purpose of securing a basic price on common lumber, that the price for railroad ties f. o. b. car as quoted by the Chicago, Milwaukee & St. Paul Ry. shall be accepted; and in the event of no quotation by the Chicago, Milwaukee & St. Paul Ry. then the price as quoted for ties by the Oregon-Washington Railroad & Navigation Company shall be accepted. Both prices shall be f. o. b. car at Morton, Lewis county, Washington or point nearest to mill on railway.

"(4) The 'Buyers' agree to pay for all of said timber, standing or felled at the rate of two dollars and fifty cents ($2.50) per thousand feet, mill scale.

"(a) It is agreed between the parties to this agreement that if the price for ties as mentioned hereinbefore under paragraph 3 of this agreement should drop below $16 per thousand; that cutting, logging and milling operations as provided herein may shut down and the time limit in which to log, mill or remove said timber shall be extended for a period equal to the time said operations shall have been shut down.

"(b) In event that the road or highway over which it is necessary to haul lumber from the property herein described to the railroad, is closed by the county or state, exclusive of the period of suspension as provided under clause (d) of paragraph 2, it is agreed that cutting, logging and milling operations as provided herein may shut down and the time limit in which to log, mill or remove said timber shall be extended for a period equal to the time said operations shall have been shut down.

"(c) Payment for timber as covered by this agreement shall be made as follows: The 'Buyers' shall deposit bill of lading with the.........................Bank, of ........................................, Washington for each shipment of timber or product thereof, made, subject to and in accordance with agreement to be entered into by and between all parties to this agreement and said bank, which agreement shall stipulate that all bills of lading for all shipments made will be deposited in said bank for collection, and from the proceeds of each and every bill of lading, the said bank will pay to said 'Owners' or their order the sum of two dollars and fifty cents ($2.50) per thousand feet as per bill of lading when collected by said bank. It is mutually agreed that all parties to this agreement will look to said bank for information as to the payment of or for said bill of lading.

"(d) It is Agreed that any lumber, logs or timber of any character sold by the 'Buyers' other than in the manner above specified, that statement for such sales shall be mailed to the 'Owners' by the 'Buyers' not later than the 15th day of the following month in which

such sales are made, together with remittance for $2.50 per thousand feet, mill scale for such products sold.

"(5) The 'BUYERS' undertake to cut, log, remove and mill in a workmanlike manner all of the aforesaid timber in a clean and thorough manner as logging and milling operations proceed, and to leave the premises either upon conclusion of said operations or at the expiration of the time limit for the removal of said timber, clean and free from debris and refuse or accumulation of waste materials, as is customary in logging and milling operations.

"(6) The 'BUYERS' further covenant and agree that they will at all times protect and save harmless the 'OWNERS' from any and all liens or claims of liens, damages or claims whatsoever, caused by or arising out of, or in connection with its logging and milling operations upon said premises.

"(7) The 'BUYERS' do hereby agree, to secure the faithful performance of this contract and each and every covenant and condition hereunder, to pay to said 'OWNERS' the sum of ONE THOUSAND DOLLARS ($1,000) and execute two promissory notes of even date of this agreement, payable on or before one year after date in the following sums and manner: $500 and $1,000 respectively; interest at 7% payable semi-annually.

"The 'BUYERS' agree to execute a chattel mortgage on mill building and machinery therein, in the sum of fifteen hundred dollars ($1,500) to secure the payment of the above mentioned notes. Said mortgage to be executed and delivered when mill is constructed and machinery placed therein, and not later than June 1st, 1925.

"(8) Upon the default in the due performance and observance of any of the covenants and conditions hereof, which default shall not be remedied by the 'BUYERS' within thirty days after notice in writing and demand for its remedy, the 'OWNERS' shall be at liberty and are hereby authorized in their option to declare this contract forfeited, and all rights of the 'BUYERS' therein or to the timber covered hereby at an end; and provided further that no waiver of any breach or de-

fault committed or suffered by the 'BUYER' shall operate as or be construed to constitute a waiver of any subsequent or different breach or default. And provided further that nothing in this contract shall be construed as depriving the 'OWNERS' in case of default hereunder of their right to assert a lien for stumpage, as now or hereafter provided by the laws of the state of Washington, upon any logs, or timber whether in the woods, at mills or elsewhere, for any unpaid amounts owing under the terms of this contract thereon.

"And in case of the forfeiture of this contract by the 'OWNERS' and a re-entry on their part in addition to such lien rights, they shall immediately become vested with full title to all logs, felled or bucked and all timber thereon, lumber, buildings and machinery therein.

"(9) AT THE EXPIRATION OF THIS CONTRACT, provided, first, all of the covenants and agreements as contained herein are faithfully and fully lived up to and performed, the 'OWNERS' agree to pay said 'BUYERS' the sum of TWENTY-FIVE HUNDRED DOLLARS ($2,500) in full satisfaction and settlement, and for the further consideration of the cancellation of this agreement.

"(10) The 'OWNERS' agree to secure an assignment of the lease dated February 12th, 1924, by and between E. C. WILBUR doing business as the TIMBER PRODUCTS Co. and Fred D. Frost and wife, to said buyers. Said 'BUYERS' agree to pay the sum of One Hundred and Twenty-Five Dollars ($125) to E. C. Wilbur, on the signing of this agreement, being the consideration of said lease, and to further assume all of the rights and obligations as contained therein. A copy of said lease is attached to and made a part of this agreement.

"(11) IT IS FURTHER AGREED that the 'OWNERS' do hereby agree to and consent with the 'BUYERS' that they (the Buyers) shall have the right to cross any of the property as mentioned herein for the purpose of removing timber on adjoining property within a period of twenty years from date of this agreement. It being agreed that all timber, standing or felled, shall be cut

and removed from the property described in this agreement before timber on adjoining property is cut.

"(12) The 'BUYERS' agree that for all times during such period as this agreement shall be in full force and effect, or during such time as the 'BUYERS' shall cross said property in their logging operations, that they will well and truly pay the taxes and fire patrol charges if any as may be levied by the state of Washington or the county of Lewis against such property, and they will on or before the first day of June of each year during the life of this agreement deliver to said 'OWNERS' a proper receipt for taxes and for fire patrol charges as may be levied against said timber and or property. 'BUYERS' to assume 1924 taxes due and payable with fire patrol charges on or before June 1st, 1925.

"IN WITNESS WHEREOF, the parties hereto have executed this agreement in triplicate the day and year first above written.                Carl E. Wilbur,
                                    "Gertrude H. Wilbur,
"WITNESSES:                                        "OWNERS.
    "Stanley G. Morrison.
                            "Garfield Taylor,
                            "B. H. Taylor,
                            "Nellie Taylor."

In accordance with the terms of the contract, the appellants, upon the execution thereof, paid to respondent $1,000 in cash and executed two promissory notes, one for $500 and the other, the note now in suit, for $1,000. The $500 note was, subsequently and before its maturity, fully paid. Subsequently, a written extension of time for the construction of the mill to July 1, 1925, and an extension of the time of beginning logging operations to September 1, 1925, was entered into. It is admitted that the mill was never constructed and logging operations were never commenced. It is also admitted that the taxes falling due on or before June 1, 1925, were not paid, and that on August 24, 1925, respondents gave written notice of forfeiture as follows:

"August 24, 1925.

"Mr. Garfield Taylor,
"Shelton, Washington.

"Dear Sir: Pursuant to paragraph numbered 8 of agreement executed by yourself with Carl E. Wilbur and wife, dated December 1, 1924, you are advised that you have breached the same by failure to construct the mill referred to in said agreement and place the machinery therein at the time specified. Pursuant to subsection C of paragraph numbered 2, you have failed to commence any operations in connection with said paragraph within the time specified and any extension thereof.

"You are further notified that the payment of $125 to E. C. Wilbur, as provided by paragraph numbered 10 of your agreement, has not been complied with.

"You are further advised that the 1924 taxes levied against the premises, together with the fire patrol charges which you contracted and agreed to pay, pursuant to paragraph numbered 12 of your agreement, have not been paid.

"This letter is written to you demanding compliance with the foregoing terms hereof and demanding compliance with all of the terms and conditions of said agreement within thirty days after the receipt of this letter by you, and in the event of the failure to comply herewith within the time stipulated herein you are advised that all of your purported interest in the premises covered by said contract and in and to said contract and all timber referred to therein will be deemed cancelled and forfeited and all of your interest therein or thereto will be entirely terminated. You may govern yourself accordingly."

Nothing was done by the appellants to cure the alleged defaults specified in the forfeiture notice, and respondent appears to have resumed possession of his property, if he had ever parted with the possession, and he thereafter brought this suit upon the note, claiming the amount thereof as liquidated or stipulated damages for the breach of contract. It appears

from the appellants' evidence, so far uncontradicted, that at no time after the contract was entered into until after the forfeiture were ties ever of the market value of $16 per thousand, as specified in subdivision (a) of paragraph 4 of the contract, and they therefore argue that the time never arrived for performance by them of the covenants to erect the mill and begin cutting the timber.

Their evidence also shows that the mill contemplated was at all times owned by the appellants, that it was a small tie mill easily transported and could, at any time, have been taken to the contemplated mill site and set up ready for operations in less than ten days. They also claim that they complied with paragraph 10 of the contract by tendering to E. C. Wilbur the sum of $125 within a reasonable time after the contract was entered into, but their testimony in this respect shows clearly that they did not pay or tender to E. C. Wilbur anything more than $65, claiming, at that time, that E. C. Wilbur was indebted to them upon an unliquidated claim to the amount of $60.

Possibly, had their claim against E. C. Wilbur been liquidated, it might have been held that the evidence was sufficient to take the question of a tender to the jury, but where, as here, one contracts to pay a specified sum, it cannot be held that the offer to satisfy an unliquidated claim against the payee and tender of an amount less than that specified is sufficient. We are forced to the conclusion, therefore, that the trial court was justified in holding that the testimony was insufficient to take the question of a tender to the jury, and that there was a breach also by reason of the nonpayment of the taxes which were due June 1, 1925. The amounts, in money, of these breaches were comparatively small, nothing in the record indicating that the taxes due amounted to more than $125.

These breaches, though small and involving inconsiderable amounts, were yet such breaches of contract as would warrant its forfeiture. They were specified in the forfeiture notice, reasonable time was thereby given for the curing of these defaults and, they not having been cured, the forfeiture became effective.

. ██ The real question here, and it is a perplexing one, is as to whether the $1,000 paid in cash by the appellants and the amount represented by their notes for $500 and $1,000 is to be considered as liquidated or stipulated damages, as found by the trial court, or as a penalty. The general rules governing the question are well stated in 17 C. J. 933, 934 and 935, as follows:

"The distinction between a penalty and a provision for liquidated damages is that a penalty is in effect a security for performance, while a provision for liquidated damages is for a sum to be paid in lieu of performance. A provision in a contract as to the sum to be paid in event of breach will, if it is a provision for liquidated damages, be enforced according to its terms; if it is a provision for a penalty, the recovery will be limited to the actual damages sustained. The importance of this distinction is obvious and the principal difficulties and conflicts in the cases occur in connection with the determination of the character of the particular agreement involved. . . .

" 'Whether,' it has been said 'a sum named in a contract to be paid by a party in default on its breach is to be considered liquidated damages or merely a penalty, is one of the most difficult and perplexing inquiries encountered in the construction of written agreements.' It seems to be generally conceded, indeed, that each case must be permitted to stand pretty much on its own peculiarities and particular facts, and that no general rules applicable to all contracts are deducible. The question is one to be determined by the contract, fairly construed. Where the parties have agreed on the amount of damages, ascertained by fair calculation and adjustment, and have expressed this agreement in clear and explicit terms, the amount so

fixed will be treated as the true damages and not as a penalty. . . .

"In determining whether a provision is for liquidated damages or for a penalty, the contract should be considered in the light of the circumstances surrounding the parties at the time of its execution."

Taking the first condition set out in the text quoted, and considering the contract as a whole, can it be said that the $2,500 evidenced by the cash and notes was intended to secure performance of the contract, or is it a sum intended to be paid in lieu of performance?

It seems to us quite clear that the contract contemplates the first, and not the last, for the following, among other, reasons:

The purchase price of the timber was not a lump sum or a fixed amount, but stumpage merely, the amounts to be determined and paid as the timber was cut, removed and marketed. Therefore, it was essential from the seller's standpoint that he have security for the monthly accounting and the payments which were to become due him as the timber products were marketed. The principal purpose of the deposit must, it seems to us, in reason, have been to secure the payment of the stumpage in accordance with the terms of the contract.

The contract, by its terms, supports this view, for in it there is no word of a forfeiture of the deposit or any part of it, but on the contrary, it is provided in paragraph 7:

"The 'Buyers' do hereby agree, to secure the faithful performance of this contract and each and every covenant and condition hereunder, to pay to said 'Owners' the sum," etc.

This language seems to exactly meet the test indicated in the text already quoted and to make the deposit security for the performance of the contract and

not liquidated damages to be paid in lieu of the performance.

But it is argued that the seller may also have had in mind a possible loss arising from being deprived of the right of disposition of his timber while it was tied up by the contract, or a loss of value to some uncut portion remaining after a part performance. True, he may have had this thought in mind, but he did not express it in the contract and we can hardly overlook the plainly expressed security features of the contract in favor of the unexpressed conjectural features indicated.

"The parties call the sum a penal one. They do not name it as liquidated damages. Nor do the circumstances and the nature of the case indicate that it should be considered other than as a penalty. Great reluctance is shown in construing as liquidated damages a sum expressly called penal. 1 Sedgw. Damages, § 410. The language in this regard is not conclusive, but it indicates the intention of the parties. To overthrow the intention thus expressed, there must appear considerations forcibly indicating a contrary one. We do not observe such considerations in this case. That which Chief Justice Marshall said, in an analogous case, applies here: 'In general a sum of money in gross to be paid for the nonperformance of an agreement is considered as a penalty. . . . It will not, of course, be considered as liquidated damages. . . . Much stronger is the inference in favor of its being a penalty, when it is expressly reserved as one. The parties themselves denominate it a penalty, and it would require very strong evidence to authorize the court to say that their own words do not express their own intention.' *Tayloe v. Sandiford,* 7 Wheat. 13, 5 L. ed. 384." *Wilkes v. Bierne,* 68 W. Va. 82, 69 S. E. 366, 31 L. R. A. (N. S.) 937.

Again, when an executory contract contains several distinct stipulations for the doing of different things of varying degrees of importance, and there is a gen-

eral provision to pay a gross sum for the breach of any, it is generally held that the provision is for a penalty rather than for liquidated damages. See annotations and cited cases, 48 A. L. R., beginning p. 906.

But we are not without cases of our own bearing upon this question.

We do not consider or discuss those of our cases involving executory contracts of sale where that part of the purchase price paid before default was, by the terms of the contract, retainable by the vendor as liquidated damages in the event of forfeiture, because the sum involved here was in no sense, under the terms of the contract, a payment on account of the purchase price.

In *Madler v. Silverstone,* 55 Wash. 159, 104 Pac. 165, all of our previous cases touching upon the point were reviewed and the result of those cases is stated thus:

"It would too unduly extend this opinion to set at length the reasoning by which those several decisions were justified, but the same principle runs through all of them. Generally speaking, it may be said that, when the damages arising from the breach of the contract which the obligation is given to secure are uncertain in their nature and not readily susceptible of proof by the ordinary rules of evidence, and are not so disproportionate to the probable damages suffered as to appear unconscionable, and it is reasonably clear from the whole agreement that it is the intention of the parties to provide for liquidated damages and not a penalty, such a stipulation will be held to be one for liquidated damages. On the other hand, if the stipulation is inserted to secure the payment of a definite sum of money, or if the actual damages suffered are easily ascertainable and are less than the stipulated sum, or. if the principal agreement contains provisions for the performance or nonperformance of several acts of different degrees of importance, and the stipulated sum is to be paid on the violation of any or all of them, and the sum will in some instances be too large, or if from

an examination of the written agreement it is uncertain whether it was the intent of the parties that the stipulation was intended as liquidated damages, or as a penalty, it should be treated as a penalty.''

We think this case clearly falls within that part of the rule which is there last stated.

*Myers v. Ralston,* 57 Wash. 47, 106 Pac. 474, clearly recognizes the rule we have already stated as applicable to a contract providing for the performance of several acts of different degrees of importance.

*Herberger v. Orr Co.,* 62 Wash. 526, 114 Pac. 178, holds in favor of liquidated damages and against penalty, since the inconvenience, loss, expense and damage arising from a breach are not readily susceptible of proof and the sum is not disproportionate to the probable damages.

In *Stoner v. Shultz,* 69 Wash. 687, 125 Pac. 1026, notwithstanding the term liquidated damages was used in the contract, under the facts in the case and applying well settled rules, it was held that a penalty only was intended.

Again in *Sledge v. Arcadia Orchards Co.,* 77 Wash. 477, 137 Pac. 1051, an agreement providing in terms for stipulated damages was held to authorize recovery of a penalty only because the contract provided for the doing of different things of varying degrees of importance, which could not be the proper subject for stipulated damages in the same amount.

We have other cases, but they clearly fall into one class or the other and nothing could be gained by attempting to analyze them.

As we have already said, while the law is reasonably certain, the difficulty is in applying it to the particular facts. We feel quite convinced that, taking this contract by its four corners and considering the situation of the parties at the time it was entered into, we are

quite in line with all of our previous decisions and with the great body of authority everywhere in holding that the contract provides for a penalty only, and therefore recovery must be limited to the actual damages sustained.

The judgment appealed from is reversed with directions to grant a new trial in which respondent may offer evidence as to the actual damages sustained by him, and, if his actual damages be found to exceed the $1,500 already deposited in cash, he will be entitled to a verdict on the note for the amount of such excess, but if his actual damages be found to be less than the $1,500 already deposited, the verdict should be in favor of the appellants for the excess of the cash paid over the amount of damages and the cancellation of the note.

MITCHELL, C. J., PARKER, BEALS, and MILLARD, JJ., concur.