**WHITESIDE v. ROCKY MOUNTAIN FUEL CO.**

**In re STANDARD COAL MINE, Inc.**

**No. 1619.**

Circuit Court of Appeals, Tenth Circuit.

Nov. 14, 1938.

Rehearing Denied Feb. 14, 1939.

Cass M. Herrington, of Denver, Colo. (G. Walter Bowman, of Denver, Colo., on the brief), for appellant.

766

Albert L. Vogl, of Denver, Colo. (Frank A. Wachob, of Denver, Colo., on the brief), for appellee.

Before LEWIS, PHILLIPS, and WILLIAMS, Circuit Judges.

LEWIS, Circuit Judge.

May 1, 1937, Standard Coal Mine, Inc., a Colorado corporation, filed its petition to be adjudicated bankrupt, and on May 3, 1937, the order of adjudication was entered. For sometime theretofore it had been operating a producing coal mine in Colorado under a sub-lease given to it by appellee. On May 14, 1937, appellee filed its claim against the estate for $13,698.61, charging that bankrupt was at and before the filing of the petition for adjudication indebted to it in that sum—
"and also all machinery, equipment, tools and other personal property and trade fixtures at the Standard Mine.

"That the consideration for which said debt was contracted is as follows: Royalties, taxes and maintenance of Standard Mine pursuant to the terms of the lease, and as agreed stipulated liquidated damages for defaults under the lease as therein provided."

The referee had a hearing, allowed the claim in part ($5,571.28), and ruled that the claimant had a lien on certain personal property of the bankrupt estate as set forth in the lease, section 7; but did not have a right to take and keep the said personal property as liquidated damages pursuant to section 8 of the lease. No definite time is stated when or under what circumstances the lease was terminated, either in the claim or in proof.

Both parties petitioned for review by the District Judge of the referee's ruling. The Judge made no comments or findings on the parts of the claim allowed by the referee amounting to $5,571.28, but reversed the referee on his holding that claimant had no right to take and keep the personal property described in section 8 as liquidated damages. In that respect he reversed and set aside the referee's order and—
"ordered and decreed that claimant, The Rocky Mountain Fuel Company is entitled to all improvements, buildings, machinery, tools, implements, equipment and property of whatsoever kind, including the leasehold interest, which the bankrupt placed or used upon the premises described in the sub-lease from the claimant to the Bankrupt, being the property known as the Standard Mine, as liquidated damages free and clear of all claims of the Trustee in Bankruptcy therein or thereto.

"2: That in view of the foregoing decision and order the questions presented as to claimant's claim for a lien under section 7 of the aforesaid sublease and the question of the amount of claimant's claim otherwise probable in bankruptcy become immaterial and this Court makes no decision thereon." Thereupon the case was brought here under both section 24 and section 25 of the Bankruptcy Act, 11 U.S.C.A. §§ 47, 48.

While the sub-lease and amendment to it is the basis of appellee's claim, we set out its terms in part only, and summarize other parts that bear on the points at issue. The lease was executed on February 27, 1936, by the appellee and bankrupt. It was approved and consented to by the owner of the land from whom appellee then had a long term coal mining lease which had been given April 1, 1933. It recited that the sub-lessor was the owner of the buildings, machinery, mining equipment, personal property, supplies, office fixtures, and all other equipment and appurtenances then on and beneath the surface of the land; that the lessee desired to lease, mine and market the coal therefrom and use the buildings, machinery, mine equipment, personal property, supplies, office fixtures, and all other equipment then on the surface and beneath the surface of the said real property, and to operate what was known as the Standard Mine then open by shafts, situate in the County of Boulder, Colorado; that the upper seam of coal had been mined out; that the entries, water ways, sumps and equipment located in the upper seam must be maintained, and the lessee agreed to do so at its expense; that the hoisting shaft and the air shaft had been extended below the upper seam of coal to the lower seam, and that same had been somewhat developed; that the lessor by the lease agreement leased and demised to the lessee the mine and premises and all that portion of the equipment, improvements and other personal property there located included in an attached inventory for a term of fifteen years from the date of the lease with the right and privilege to mine, excavate and remove coal from the lower and middle seams only, together with so much of the surface thereof as might be necessary for sinking shafts or other openings through which to take out coal and for ventilation, and the necessary buildings required in mining coal or in handling same, and ways of ingress and egress, and for the removal

of coal from said premises, and for necessary dwellings, all in consideration of the payments to be made and covenants and agreements therein to be kept and performed by the lessee; that lessee undertook and agreed to occupy and hold said premises for the full term of fifteen years unless such term be sooner terminated pursuant to any of the provisions of the lease, to continuously carry on mining operations upon said tract of land, mine and extract coal therefrom with a force and equipment sufficient for the production of the minimum requirements under the lease, and to so work the mine as to keep the entire property in a workmanlike mining condition and have the mine in such condition at the termination of the lease, and at all times to keep the leased premises free and clear of any liens; and that the lessee would pay to the lessor a royalty of 35¢ per ton of 2000 pounds run of mine coal, and for the calendar year 1936 would pay a minimum rental or royalty on 5000 tons amounting to $1750, and for the calendar year 1937·and each calendar year thereafter a minimum royalty on 15,000 tons amounting to $5250, payable $437.50 per month. Before the year 1936 expired the parties by written amendment to the lease reduced the per annum minimum royalty for 1937 and each year thereafter to $3750 payable in monthly installments. The 7th section of the lease deals with the claimed lien on the equipment and improvements to be made by the lessee at the mine, thus:

"Lessee covenants and agrees that at the expiration of the term or period of this agreement, or in the event such term or period is ended or terminated in any manner other than by lapse of time, as in this instrument provided, Lessee will peaceably, and without demand or request, deliver up possession of said premises to the Lessor, its successors or assigns, in good order and condition, and that it will, during the continuance of this agreement, keep the said lands, and all improvements, equipment and materials thereon or therein, including improvements, equipment and materials to be placed thereon or therein by Lessee, and every part and parcel thereof, free, clear and discharged of and from any and all liens of workmen, mechanics and material men furnishing labor or material to or for Lessee, and free of liens or claims of any kind or character whatsoever, which may be, or might be, claimed or allowed to be superior to the lien of Lessor or rights of the Owner, its successors and assigns; Les-

see shall at all times keep posted two copies of 'Notice—All Persons Doing Work or Furnishing Materials, Machinery, Etc.' at the mine in conspicuous places, which notices will be furnished by Lessor.

"It is further mutually and expressly understood and agreed between the parties hereto that all movable buildings, machinery and equipment and other personal property, placed upon said premises by Lessee shall, except as hereinafter provided, be and remain the property of Lessee. For the purpose of this provision, props, shafts, permanent buildings and all other improvements hereafter affixed to the leased premises, or any part thereof, and which cannot be removed without subjecting the mines to danger, or damage, shall be held to be fixtures annexed to the real estate and shall not be removed by Lessee.

"Lessor shall have a first and prior lien upon all the improvements, buildings, machinery, tools, implements, equipment, and property of whatsoever kind, including the leasehold interest hereby granted, which the Lessee may hereafter place or use upon said premises, or any part thereof, or which the Lessee shall, or may have caused to be placed on said premises, or any part thereof, as security for the payment of the rent or royalties, and the performance of the obligations and covenants provided for and mentioned and set forth in this agreement. In the event of default hereunder and Lessor elects to foreclose its lien herein granted, the property to which such lien attaches may be sold at public or private sale at the election of Lessor and Lessor may become a purchaser at such sale."

The 8th section deals with the claimed liquidated damage provisions, thus:

"In case of termination of this lease or agreement on account of any default on the part of Lessee, neither it, nor its successors or assigns, shall have any right to compensation for any of the improvements, personal property, equipment, etc., as aforesaid, whether the same be attached to said property or detachable and movable, and shall not have any right to take away, or remove, any thereof, but all of such improvements, personal property, equipment, etc., shall become the sole property of Lessor as its or their liquidated damages, and not as a penalty or penal sum, or in the nature thereof, the value thereof being hereby agreed to as a just and reasonable compensation to said Lessor for the dam-

age by it, or them, sustained by reason of the default of the Lessee, all without prejudice to the right of said Lessor to recover further damages in any appropriate proceedings."

Therein the parties agreed that if lessee should terminate the lease by any default on its part it should not have any right to compensation for any improvements, personal property, equipment, etc., as aforesaid, that it might put on or under the leased premises and no right to take away any thereof, but they should all become the sole property of lessor as its liquidated damages and not as a penalty or penal sum or in the nature thereof, the value thereof being agreed to as a just and reasonable compensation to the lessor for the damage sustained by it by reason of the default of the lessee, all without prejudice to the right of said lessor to recover further damages in any appropriate proceedings. It is not probable or hardly conceivable that the lessee had put any personal property at the mine for use there when the lease was executed; therefore, they did not and probably could not place any value on it. No sum was named as the agreed or stipulated amount of damage which the parties agreed was the damage that would be sustained by the lessor in event lessee should by its default terminate the lease, and lessor retained the right to recover further damages in any appropriate proceedings. Does said section 8 of the lease contain a valid "stipulated liquidated damage" clause for terminating the lease? Claimant in sworn verification of its claim stated that the bankrupt—

"was at and before the filing of said petition and still is justly and truly indebted to said corporation (claimant) in the sum of Thirteen Thousand Six Hundred Ninety-eight Dollars and Sixty-one Cents and also all machinery, equipment, tools and other personal property and trade fixtures at the Standard Mine.

"That the consideration for which said debt was contracted is as follows: Royalties, taxes and maintenance of Standard Mine, Lafayette, pursuant to the terms of the lease, Exhibit B hereto attached, and as agreed stipulated liquidated damages for defaults under the lease as therein provided."

The verified proof of claim proceeds: The lease gives—

"this claimant a lien on all machinery, equipment, improvements and personal property at the Standard Mine for security for the performance of the obligations and covenants and for the rentals and royalties provided for in the lease and also the provision of said lease that all said improvements, equipment and personal property shall become the sole property of this claimant as liquidated damages for the termination of the lease upon lessee's default."

On June 6, 1937, the trustee petitioned the referee for an order permitting him to disclaim title to the lease and refuse to take same into his possession as an asset of the estate and to abandon it as of May 1, 1937, the day of adjudication. The referee found there was no evidence of termination of the lease by the bankrupt other than the bankruptcy proceedings.

■ It seems to us to be well nigh indispensable to the covenantor's liability and interest and the covenantee's rights that the damages should have been stated in amount, else all basis for judicial inquiry pressed here, as to whether *penalty* or *liquidated damages* was the intention of the parties, is absent. Those italicized terms are freely interchangeable to that end. See Pomeroy's Equity Jurisprudence, Sec. 441 et seq.; Snell's Principles of Equity, 1st Am.Ed., Ch. XX; Bouvier's Law Dictionary, "Liquidated Damages". Numerous cases in the foregoing citations have been read and considered. The relation of the parties and their liabilities are not like those between the ordinary landlord and tenant where occupation and rental value are the sole considerations. Here the right to extract coal and its use or sale by the lessee, the mine being kept in proper condition, are the chief rights and duties of the lessee. When the lessee ceases to mine, the additional coal which he would have taken out if he had continued reverts to the lessor's benefit to be taken out by him or some other sub-lessee. So the lessor's damage in such case can not be said to be the full amount of the minimum royalties during the remainder of the lessee's term. Moreover, in this case the lessor within the first year of the lease reduced the minimum royalties to be paid to it from 35¢ to 25¢ per ton. On the facts stated and for the reasons stated, it is our opinion that claimant has no right by virtue of the terms of said section 8 of the lease to take and hold as its property the personal property of bankrupt described and referred to in said section 8.

■ We next notice the third paragraph under section 7 of the lease. It is copied supra. In terms it gives the lessor a first and prior lien on all the improvements, buildings, machinery, tools, implements, equipment, and property of whatsoever kind, including the leasehold interest, which the lessee might thereafter place or use upon the premises or any part thereof, or which the lessee should cause to be placed on any part thereof as security for the payment of the rent or royalties and the performance of the obligations and covenants mentioned and set forth in the lease agreement. It further provided in event of default by the lessee and the lessor elects to foreclose its lien, the property to which such lien attached may be sold at public or private sale at the election of lessor and lessor may become the purchaser at such sale. Also, bankrupt's schedule of its personal property, under the heading, Machinery, fixtures, apparatus, and tools used in business, has this item: "See list attached which property is subject to lien in the lease in favor of Rocky Mountain Fuel Co. $18,185.00." A list was attached to schedule B (2) K of the personal property. In our opinion the last paragraph of section 7 of the lease created an equitable lien on the property therein described.

Mr. Justice Grier in delivering the opinion of the court in Peck v. Jenness, 7 How. 612, 12 L.Ed. 841, noted this distinction between a common law lien and an equitable lien.

"At common law there can be no lien without possession. It is there defined, a right in one man to retain that which is in his possession belonging to another, till certain demands of him, the person in possession, are satisfied. (Hammond v. Barclay, 2 East, 235.) In maritime law, liens exist independently of possession, either actual or constructive. In courts of equity, the term lien is used as synonymous with a charge or encumbrance upon a thing, where there is neither jus in re, nor ad rem, nor possession of the thing." [Page 620.]

The same principle is noted in Walker v. Brown, 165 U.S. 654, 662, 663, 669, 17 S. Ct. 453, 41 L.Ed. 865, and Lewin v. Telluride Iron Works Co., 8 Cir., 272 F. 590.

Jones on Liens discusses in his first volume common law and equitable liens. As to the first he says that to be valid possession must be in the creditor, but that such possession is not required in support of an equitable lien; that they are sustained and enforced from equitable considerations; that they—

"do not depend upon possession as do liens at law. Possession by the creditor is not essential to his acquiring and enforcing a lien. * * * In courts of equity the term 'lien' is used as synonymous with a charge or incumbrance upon a thing, where there is neither jus in re, nor ad rem, nor possession of the thing. The term is applied as well to charges arising by express engagement of the owner of property, and to a duty or intention implied on his part to make the property answerable for a specific debt or engagement." (Sec. 28)

In Section 42 of Chapter II he says:

"There may be an equitable lien upon future property. Whenever a positive lien or charge is intended to be created upon real or personal property not in existence or not owned by the person who grants the lien, the contract attaches in equity as a lien or charge upon the particular property as soon as he acquires title and possession of the same. An equitable lien upon future property may be even more effectual than such a lien upon property in existence, for the registration laws apply to liens upon property in existence, but not to liens upon future property. Therefore it happens that, while, as against creditors, a lien cannot be created by contract upon a personal chattel in existence at the time of such contract without registration, yet, as this rule does not apply to a contract in regard to future property, a lien effectual as against creditors may be created by agreement upon future property, such, for instance, as the products of a farm, or the profits of the farm, not then in existence."

■ Considering the nature of an equitable lien, how it may be created and its constituent elements, it would be difficult indeed to conceive how the chattel mortgage act could be complied with by the holder of such equitable lien. The chattel mortgage act requires that the mortgage itself, the physical document, shall be filed or recorded. True, a written statement of the facts that go to constitute an equitable lien could be made, a verification of the truthfulness thereof attached, and as thus made up it could be filed with the county clerk and recorder, but no intention to require that such action be taken can be deduced from the chattel mortgage act, or any Colorado statute. 1935 Colo.Stat.Ann., Ch. 32, Sec. 1, reads:

"Except as hereinafter provided, no mortgage of personal property shall be valid against the rights and interests of any third person or persons unless possession of such property be delivered to and remain with the mortgagee, or the mortgage be acknowledged and certified, and filed or recorded as provided in this chapter."

Section 4:

"Every chattel mortgage shall be good and valid between the parties thereto until the indebtedness secured thereby is paid or barred by the statute of limitations."

Section 5:

"Any person who buys or otherwise obtains an interest in any personal property covered by a mortgage, which is valid and effective between the parties thereto, with actual notice of such mortgage, shall be considered to have bought or obtained such interest subject to the mortgage, the same as if the mortgage had been executed and filed or recorded pursuant to the provisions of this chapter."

There is no evidence here that any other creditor of bankrupt has or is asserting a lien on any property described in said third paragraph of said section 7 of the lease. The lease was filed for public record and recorded eight days before bankruptcy. The equitable lien was at all times good as between claimant and bankrupt, after as well as before bankruptcy, under Colorado law. Martin v. Commercial Bank, 245 U. S. 513, 38 S.Ct. 176, 62 L.Ed. 441; Bailey v. Baker Ice Mach. Co., 239 U.S. 268, 36 S.Ct. 50, 60 L.Ed. 275; Taubel, etc., Co. v. Fox, 264 U.S. 426, 44 S.Ct. 396, 68 L. Ed. 770. No fraud is charged in the transaction between claimant and bankrupt. The rule in Colorado is stated in Bogdon, Trustee, v. Fort, 75 Colo. 231, 235, 225 P. 247, 248, that the weight of authority is that "creditors or third persons" are not general creditors; that neither the bankrupt nor the bankrupt's trustee is in that class; that the latter stands in the shoes of the bankrupt; and that no one except for valuable consideration and without notice can acquire an interest in property as against valid prior liens.

Reversed as to the court's order and decree of September 21, 1937, wherein it was found and adjudged that section 8 of the lease contains a valid and enforceable liquidated damage provision. Remanded with directions to the court to enter an order and decree adjudicating that the third paragraph of section 7 of said lease gave and granted to the lessor, The Rocky Mountain Fuel Company, a valid and enforceable equitable lien on all the property described in said third paragraph of section 7; that the court ascertain and fix from the proof adduced before the referee the amount of lessor's lien and direct sale of said personal property in satisfaction thereof, accounting to the trustee for any excess realized, but, if the amount realized be not sufficient to satisfy said lien in full, that said lessor share pro rata with general creditors for satisfaction of such deficiency of its claim.

PHILLIPS, Circuit Judge (concurring).

The majority opinion has my concurrence, but it seems desirable to me to state additional reasons for the conclusion that the claim for liquidated damages should be denied.

It will be observed from section 8 set forth in the majority opinion that the liquidated damages are to indemnify the lessor for damage sustained "by reason of the default of the lessee" and not for damages resulting from a termination of the lease. In that respect it differs from the lease before the court in Burns Trading Co. v. Welborn, 10 Cir., 81 F.2d 691, 695, 106 A. L.R. 285.

The sub-lease contains many covenants to be kept and performed by the lessee, namely: to carry on the mining operations with a force and equipment sufficient for the production of the minimum requirements under the sub-lease, to work the mine and carry on the mining operations in a workmanlike and mininglike manner, to turn rooms in the mine in such a way as to save all the coal reasonably possible, to provide passages for air and keep the same open at all times, to keep the mine shafts and other openings in proper condition, to repair without delay any injury to the mine and keep it in good working order and condition, to keep the mine open for inspection by the lessor, to comply with state and national laws respecting coal mining, to indemnify the lessor against loss on account of any violation of law by the lessee, to pay certain stipulated royalties and certain stipulated minimum royalties, to keep full, true and accurate records of the amount of coal mined, to furnish to the lessor on or before the fifth day of each month a true and complete account of all coal mined during the preceding month, and to indemnify the lessor for the costs and expenses, including attorneys' fees, incurred in defending any suit or suits

brought against lessor for the violation of law by the lessee or on account of any other failure, neglect or default of the lessee in keeping and performing the covenants of the lease. These covenants are of varying degrees of importance. It is well settled that where a contract contains a number of such covenants a provision that a fixed sum shall be paid for breach of any one is a penalty. Burns Trading Co. v. Welborn, supra, 81 F.2d at page 694; Seidlitz v. Auerbach, 230 N.Y. 167, 129 N.E. 461; Wilbur v. Taylor, 154 Wash. 282, 282 P. 65; Gross v. Exeter Mach. Works, 277 Pa. 363, 121 A. 195, 197; Graves v. Fitzpatrick, 127 Okl. 124, 260 P. 10, 11; O'Brien v. Illinois Surety Co., 6 Cir., 203 F. 436; Chicago, B. & Q. R. Co. v. Dockery, 8 Cir., 195 F. 221.

For the reasons indicated it is my opinion that section 8 provides for a penalty rather than liquidated damages.

Section 11 of the sub-lease reads as follows:

"It is further agreed that in case of default by Lessee in any of the provisions of this agreement, except as otherwise provided in paragraph 13 hereof, Lessor may, at any time when any such default exists, at its election, serve written notice upon Lessee by mailing same to Lessee in properly sealed, stamped and registered envelope addressed to Lessee c/o Otto Friedrichs, First National Bank Building, Denver, Colorado, notifying Lessee of the claimed default, and that unless within fifteen (15) days after the receipt of such notice the Lessee shall correct such default, and fully comply with all and singular the terms of this lease in that regard (said notice to specify wherein Lessor claims that Lessee is in default), it will declare this lease terminated and the term hereof ended; and that in the event such default shall not be cured, or action taken to that end to the Lessor's satisfaction within said time said Lessor may, without further notice, thereupon declare said term ended, and this lease terminated, and may thereupon enter into and take possession of the said premises as aforesaid, and all the improvements, betterments, equipment, personal property, etc., then and there being located, and hold and enjoy the same as its, the Lessor's, sole property, and in such event license and authority is hereby given to Lessor to make such entry by its officers, agents, attorneys, or employes and assistants, and to use all such force as may be deemed needful for taking possession as

aforesaid, and to oust Lessee, as well as any and all persons claiming by, through, or under Lessee, and for nothing which the said Lessor, or the officers, agents, or representatives thereof may do in connection with the taking possession as aforesaid, shall there be any liability whatsoever in any civil suit, action, or proceedings."

Section 13, excluded from the operation thereof, provides that the lessee shall carry workmen's compensation insurance.

Section 8 is only operative in the event of termination of the sub-lease "on account of any default on the part of lessee" in the manner provided in section 11. The record here is barren of any proof of the termination of the sub-lease in accordance with the provisions of section 11. True, on June 8, 1937, the referee ordered the trustee to surrender and disclaim the lease as of May 1, 1937. This, however, did not terminate the sub-lease as between the lessor and lessee. Burns Trading Co. v. Welborn, supra, 81 F.2d at page 694; In re Ells, D.C.Mass., 98 F. 967; In re Frazin, 2 Cir., 183 F. 28, 33 L.R.A.,N.S., 745; Petition of Colburn, 1 Cir., 16 F.2d 780. Therefore, it is my conclusion the lessor has not established its right to invoke the provisions of section 8.

On Petition for Rehearing.

LEWIS, Circuit Judge.

It seems to us that counsel for appellant make a wrong assumption on which they base their conclusion that appellee's equitable lien comes within the requirements of the Colorado chattel mortgage statute and had to be placed of public record, if possession of the chattels had not been taken by appellee before bankruptcy, to save its validity; and that assumption is that the Colorado Supreme Court has so construed its statute. In their brief filed with the motion they say: "The holding of the Bogdon case, Bogdon v. Fort, 75 Colo. 231, 225 P. 247, however, is controlled by one essential fact not found in this matter, i. e., in the Bogdon case the holder of an equitable lien had taken possession prior to bankruptcy." There is no such statement in the opinion in that case and no discussion of an equitable lien. The situation there was this, as stated by the court:

"This action is by the assignee of the vendor of five automobile carriages or busses which were sold to the Inter-City Automobile Lines of Denver, a corporation, and the object is a foreclosure, as chattel mortgages, of the five written instruments evi-

dencing the transaction. Whether under the decision in Bailey, Trustee, etc., v. Baker I. M. Co., 239 U.S. 268, 36 S.Ct. 50, 60 L. Ed. 275, under a similar contract, that there is a real distinction between a conditional sale and an absolute sale with a mortgage back, and that the transaction there was strictly a conditional sale, is not important here, even if the conclusion is inconsistent with Andrews & Co. v. Colorado Sav. Bank, 20 Colo. 313, 36 P. 902, 46 Am.St.Rep. 291, which held a somewhat similar contract in legal effect a chattel mortgage. This is so because the parties here are in accord that under the law of this state the disposition of this case is to be, and should be, as though the instruments in question are chattel mortgages."

The remainder of the opinion clearly shows that disposition was made on that basis.

■ In Colorado a chattel mortgage is a conveyance of personal property. It passes title to the mortgagee. If the mortgagor does not redeem on condition broken the mortgagee can recover the property in trover. Hurt v. Hubbard, 41 Colo. 505, 92 P. 908. In Tolland Co. v. First State Bank et al., 95 Colo. 321, 35 P.2d 867, 868, the court said:

"A mortgagee of land has a lien merely. Pueblo & A. V. R. R. Co. v. Beshoar, 8 Colo. 32, 5 P. 639; Laws 1927, p. 592, § 12. A chattel mortgage, on the other hand, conveys title to the chattels, subject to redemption by the mortgagor."

Appellant also cites First National Bank v. Felter, 65 Colo. 370, 176 P. 496, as an equitable lien case and within the requirements of the chattel mortgage statute. The assumption is without foundation. The court said:

"Defendant in error leased a farm to one Allen, and took a promissory note for the rent, secured by a chattel mortgage on the crops grown or to be grown on the land. * * *

"Subsequent to the making of said mortgage, the plaintiff in error made a loan to Allen, and took as security therefor a chattel mortgage on some personal property, together with 20 acres of sugar beets and other crops, already planted. * * *

"The only question to be considered is the effect of a mortgage on crops not yet planted, as against a mortgage given after the crop has been planted."

As stated by the court, each party relied on a chattel mortgage. No equitable lien was involved. Nor was such right in any manner involved in Tolland Co. v. First State Bank, supra. In J. I. Case Threshing Mach. Co. v. Glass & Bryant M. Co., 74 Colo. 535, 223 P. 35, nothing can be found in relation to the recording of an equitable lien, or in the alternative, as required by the chattel mortgage act, taking possession of the chattels by one holding such a lien. In that case the contest is between two chattel mortgagees as to which held the prior right as such on certain crops covered by each of the mortgages.

The result is, appellant's counsel cite no Colorado case and we find none construing the chattel mortgage statute as covering or applying to a purely equitable lien. Furthermore, section 2 of that statute (Ch. 32, 1935 Colorado Statutes Annotated) applies only to chattel mortgages on crops and reads:

"No chattel mortgage on any crop shall be, or be deemed invalid by reason of the mortgagee consenting or agreeing, either expressly or by implication, that the crop may be sold by the mortgagor, but the lien of the mortgage shall, in such case, continue and attach to the proceeds of the sale in the hands of the purchaser, unless the mortgagee shall have expressly waived such lien." Section 4 of said statute reads:

"Every chattel mortgage shall be good and valid between the parties thereto until the indebtedness secured thereby is paid or barred by the statute of limitations."

■ But appellant's counsel are insistent that section 20 of said statute brings a purely equitable lien within all of its terms as to its requirements of public record or possession to be taken of the chattels by a mortgagee. That section reads in this way:

"Except as provided in section 6, above, the provisions of this chapter shall extend to all bills of sale, deeds of trust and other conveyances of personal property intended by the parties to have the effect of a mortgage or lien upon such property."

How can it in reason be said that the extension made by said section covers equitable liens? The extension is specifically confined to "bills of sale, deeds of trust and other conveyances of personal property". An equitable lien is not a bill of sale, deed of trust or other conveyance. That is clearly shown by our opinion heretofore rendered on submission of the cause.

The case, In re Gallacher Coal Co., D.C., 205 F. 183, 185, is much like the case in hand on its facts. There the lien imposed was by a coal mining lease on property of the lessee that might thereafter be brought onto or in the mine for use, to secure the pay-

ment of unpaid royalties in event of abandonment. Judge Grubb in disposing of the point now in mind said:

"If record of the instrument was required in order that it might be effective as against subsequent creditors, then the trustee, under the amendment to the bankruptcy act of June 25, 1910, might avail himself of the failure to record. * * * The controlling inquiry is whether record was necessary to the validity of the lien. Sections 3376 and 3386 of the Alabama Code of 1907 are relied on as requiring the record of the lien. The language of each is identical in its description of the character of the instruments required to be recorded. It is 'conveyances of personal property to secure debts, or to provide indemnity,' in each section. In order to come within the statute, the instrument must come within the description of 'a conveyance of personal property,' and its purpose must be to secure a debt or to provide indemnity."

Judge Grubb then said:

"The lien created by the lease was a pledge of personal property for the purpose of securing the royalty fixed by the lease, which was a debt. Can it be described as a conveyance? It did not purport to transfer title or possession out of the lessee, but merely to charge the property with the payment of the royalty. * * *

"In the case of Fash v. Ravesies, 32 Ala. 451, the Supreme Court of Alabama said:

" 'The contract, then, really amounts to nothing more than a charge of the estate with a lien which may be enforced in a court of equity. There is no conveyance, either legal or equitable, to the Ralstons. There is no transfer of legal or equitable title to them. They could not, like a mortgagee, sue for and recover the property in any tribunal.' * * *

"In the case of Bailey v. Timberlake, 74 Ala. 221–224, the same court said:

" 'The statutes of registration relate only to conveyances of the legal estate in lands, not to equitable interests, often incapable of registration, and to which it is not practicable to apply the policy pervading the statutes.' "

See Lewin v. Telluride Iron Works Co., 8 Cir., 272 F. 590; In re Terrell, 8 Cir., 246 F. 743; Big Four Imp. Co. v. Wright, 8 Cir., 207 F. 535. Burroughs Adding Mach. Co. v. Bogdon, 8 Cir., 9 F.2d 54, is not in point, because in that case there was a conveyance of the personal property involved—here no conveyance.

In Watson v. Merrill, 136 F. 359, 363, 69 L.R.A. 719, the Circuit Court of Appeals for the Eighth Circuit said:

"An adjudication in bankruptcy does not dissolve or terminate the contractual relations of the bankrupt. * * * Its effect is to transfer to the trustee all the property of the bankrupt except his executory contracts, and to vest in the trustee the option to assume or to renounce these. * * * It is the discharge of the bankrupt alone, not his adjudication, that releases him from liability for provable debts in consideration of his surrender of his property, and its distribution among the creditors who hold them. Even the discharge fails to relieve him from claims against him that are not provable in bankruptcy, and, since his obligation to pay rents which are to accrue after the filing of the petition in bankruptcy may not be the basis of a provable claim, his liability for them is neither released nor affected by his adjudication in bankruptcy, or by his discharge from his provable debts. * * * Nor are those who contracted with him absolved from their obligations. If he or his trustee pays the stipulated rents for his place of residence or for his place of business, the lessors may not deny to the payor the use of the premises according to the terms of the lease. If he renders the personal services, he who contracted to pay for them may not deny his liability to discharge this obligation. His trustee does not become liable for his debts, but he does acquire the right to accept and assume or to renounce the executory agreements of the bankrupt, as he may deem most advantageous to the estate he is administering, and the parties to those contracts which he assumes are still liable to perform them. And so * * * the adjudication in bankruptcy absolves from no agreement, terminates no contract, and discharges no liability."

We noted in our former opinion that bankrupt on May 1, 1937, filed its petition to be adjudged bankrupt and also filed on that day schedules of its personal property. In Schedule B. (2) sub K it put down "Machinery, fixtures, apparatus, and tools used in the business, * * * viz.: See list attached which property is subject to lien in the lease in favor of Rocky Mountain Fuel Co. $18,185.00."Attached thereto was a list of that property and values placed on each item, amounting to $18,185.00. The trustee was appointed as such on May 26, 1937. On June 8, 1937, he made written application to the referee to abandon the lease. He stated it was of no value, but

rather a liability; that because of the condition of the mine it could not be operated profitably nor could he find a purchaser; "that your trustee has never taken possession of the said lease and therefore desires to reject and disclaim said lease as of May 1, 1937; that it will be to the benefit of said estate if your petitioner may abandon and disclaim title to said property and refuse to take the same into his possession." The order in part is this: "It is further ordered, that the trustee is authorized to reject and disclaim said sublease as of the date of May 1, 1937." On said June 8th the trustee filed a disclaimer of "any right, title or interest in and to said sub-lease and the amendment thereto as of May 1, 1937, as property of said estate" and abandoned and relinquished all claim thereto and gave written notice that he refused to take same into his possession as trustee. It further appears in the record that the lessor's employes reentered the mine on May 4, 1937, for the purpose of keeping it from being flooded, and they have since remained there for that purpose, doubtless using some of the property brought onto the mine by the lessee.

The trustee testified on June 28, 1937, and part of his testimony is this:

"Q. Did you examine the mine yesterday? A. I did not go underground. I stopped and talked to Mr. Duncan. That was the first time I had been out since the 1st of May.

"Q. Have you been underground in that mine? A. Yes, sir.

"Q. When? A. Shortly before it went into bankruptcy."

We adhere to our former opinion, the conclusion there reached, and the order therein directed. Mandate may issue.