### ARNSTEIN v. AMERICAN SOC. OF COMPOSERS, AUTHORS AND PUBLISHERS et al.

District Court, S. D. New York.
July 12, 1939.

Ira B. Arnstein, pro se.

Schwartz & Frolich, of New York City (Louis D. Frolich and Herman Finkelstein, both of New York City, of counsel), for American Soc. of Composers, Authors and Publishers, Gene Buck, John G. Paine and E. C. Mills.

Rosenberg, Goldmark & Colin, of New York City (Sydney M. Kaye and Paul A. Landsman, both of New York City, of counsel), for defendant Columbia Broadcasting Co.

Goldie & Gumm, of New York City (Leon Kellman, of New York City, of counsel), for defendant Broadway Music Publishing Co.

Wattenberg & Wattenberg, of New York City (Sidney William Wattenberg and H. W. Tepfer, both of New York City, of counsel), for defendants Music Publishers Protective Ass'n and Harry Fox.

Hays, St. John, Abramson & Schulman, of New York City (Alan S. Hays, of New York City, of counsel), for defendant Song Writers Protective Ass'n.

Fitelson & Mayers, of New York City (I. Jack London and Harold J. Sherman, both of New York City, of counsel), for defendant Sam Fox Publishing Co.

Gilbert & Gilbert, of New York City (Godfrey Cohen, of New York City, of counsel), for Irving Berlin, Inc.

A. L. Ashby and R. P. Myers, both of New York City (R. P. Myers, of New York City, of counsel), for defendant National Broadcasting Co.

Sam'l Jesse Buzzell, of New York City, for defendant Mills Music Co.

Robert W. Perkins, of New York City (Stanleigh P. Friedman and Harold Berkowitz, both of New York City, of counsel), for defendants Warner Bros. Pictures, Inc., M. Witmark & Sons, A. M. Wattenberg, E. H. Morris and Harms, Inc.

House, Grossman, Vorhaus & Hemley, of New York City (Leo J. Rosett, of New York City, of counsel), for defendant Louis Bernstein.

Theodore B. Richter, of New York City, for defendants Edward B. Marks Music Co., and Paul Jonas.

Leonard Levin, of New York City (Yale Wilner, of New York City, of counsel), for defendant Nathaniel Shilkrit.

CONGER, District Judge.

Jurisdiction of this case is obtained on the ground that the Copyright Law of the United States, 17 U.S.C.A. § 1 et seq., is directly involved.

The plaintiff appears in person. The plaintiff is a musician and composer of music. He had no attorney representing him during the trial. He conducted the case himself. He also prepared his own complaint.

The complaint is not drawn with legal precision, but does set forth plaintiff's causes of action fairly well, although there are apparently two separate and distinct causes of action therein which are not separately pleaded and set forth, but are intermingled. A careful reading and digest of the complaint shows that it contains at least two causes of action, (1) an action based on plagiarism of certain of plaintiff's musical compositions and songs by certain named defendants; (2) certain acts and conduct by practically all of the defendants to prevent plaintiff's musical compositions from being heard; to prevent plaintiff from carrying out his profession as a musician; to plagiarize plaintiff's musical compositions; and other separate and distinct acts and conduct on the part of defendants to harm plaintiff. All of the aforesaid being in connection with plaintiff's profession or in connection with his musical compositions and songs. All of these, he charges, are part of a conspiracy against him. So that, from the complaint and from plaintiff's theory of his grievances against these defendants, as evidenced by the testimony adduced at the trial and from his memorandum submitted after the trial, the plaintiff's causes of action may be grouped into two subdivisions, as follows: (1) Plagiarism of his songs. (2) Conspiracy by the defendants against him.

I shall take up the question of conspiracy first inasmuch as it concerns most of the defendants.

First, however, let me deal briefly with the plaintiff and his history. Plaintiff is fifty-seven years of age. He was born in Kiev, Russia. He commenced the study of music at an early age. From the age of six to eleven he studied in Russia; came to America when he was eleven; went to school in New York City, and studied music in New York City (composition and piano); gave recitals from time to time. At one time he was a music teacher. He composed a number of songs and compositions and made a number of arrangements. Some of his works were copyrighted and some were not. Many have been offered in evidence.

The plaintiff produced on the trial a number of musicians and singers of merit, who testified as to plaintiff's musical compositions and that they had played them in public for profit, and some who testified on the issue of plagiarism.

Practically all of the defendants are included in the conspiracy charge.

Motions were made by most of the defendants to dismiss the complaint on the ground that the court had not jurisdiction to hear it; that the action is based entirely on the Copyright Law; that there being no diversity of citizenship alleged, and that there is no allegation of more than $3,000 being involved; that the question involved under this cause of action is one of which the Federal Court does not have jurisdiction, the other jurisdictional elements being absent.

Most of the defendants rested without putting in any proof at the end of plaintiff's case.

I deny all motions to dismiss, except those granted during the trial. I believe it is for the best interests of all to decide this case on the merits.

As to the conspiracy: Plaintiff has accused practically all of the defendants of doing something to injure him and prevent him from making a living, etc. All of which he says is part of a conspiracy. The charges are serious and grave and, if true, would subject some of them at least to a criminal charge.

The plaintiff has not been modest or moderate in his accusations and charges. For instance, in his testimony he states: "All my songs that I have written have been pirated by the ASCAP (The American Society of Composers, Authors and Publishers). I still say so." Yet, in the

whole case I have been unable to find a scintilla of evidence that ASCAP or any of its members "pirated" any one of his songs.

During the trial he called one of the defendants as his own witness. When Mr. Bernstein denied knowing Mr. Arnstein, and testified that he never made a contract to produce his songs, plaintiff then made this statement: "If the man sits down and lies and says he never met me, your Honor, I have nothing more to question him about. These are all perjurors, liars and crooks and they sit down there and deny facts which the whole world knows. This man has met me a hundred times and he had a quarrel with me in his office. He was going to publish this song and he denies here that he ever met me! What can I ask him, your Honor? My testimony is over; I can't answer any more."

It seems to me that no comment need be made about this statement.

In his complaint, the plaintiff charges: "Thirty-eighth: That they have in cooperation with the other defendants and their attorneys conceived the plan of branding the complainant as a lunatic and have worked in harmony with the officers of ASCAP and MPPA (Music Publishers Protective Association) to oust the complainant from the W.P.A. and have caused him to starve."

And in his brief, he states: "That plaintiff was dismissed from the W.P.A. giving as their reason that the plaintiff suffered from a 'persecution mania' naming the ASCAP specifically. (Pln. Exh. 63 & 64)."

There was absolutely no such evidence in the case. There was no testimony, except plaintiff's on this point, together with the exhibits.

Exhibit 63 is a theatre program of the show "Help Yourself" (Federal Theatre).

Exhibit 64 is a photostatic copy of a letter, apparently an unofficial communication, between two officials of the W.P.A., as follows:

Copy

"Mr. Seegar Heavilin    August 31, 1936
                    Dictated Aug. 28th.
Alvin Robinson        Arnstein, Ira B.

\* \* \* Mr. Ira B. Arnstein was interviewed by me today. \* \* \* Mr. Arnstein stated that Mr. Nicoll and Mr. Epstein are the tools of the Society of Composers and Publishers, Inc., whose object is to plug popular songs by having them played at Federal Theatre Project productions. He pointed out that Mr. James Gottlieb who was Director of the orchestra playing for 'Help Yourself' and who refused to play popular music was removed and replaced by Mr. Epstein.

Mr. Arnstein also claims that he has written the musical score for 'Lights O' London' but that due to his persecution by the aforementioned society his music has been ignored and a different director has been assigned for the musical duration of 'Lights O' London.'

I instructed Mr. Arnstein to report to Mr. Karnot's office on Monday as he had been assigned to that project, 905, and that if Mr. Karnot had no use for him, he should request a referral to the Occupational Adjustment Bureau.

\* \* \* Mr. Arnstein may be suffering from a persecution mania. \* \* \*
                Alvin Robinson
AR:AL
cc: Marian Nathan"

The plaintiff did do work for the W.P.A. He had trouble about his music. He complained to the Director. Finally he was discharged. There was no intimation that any one of the defendants, including ASCAP, had anything to do with his discharge. It exists only in the mind of the plaintiff.

Plaintiff states in his brief: "The plaintiff has produced the following evidence as to his claim of conspiracy." "That his room was constantly ransacked and many manuscripts and letters stolen. When he complained to the Police Department no action was taken but two gorillas beat plaintiff up and plaintiff produced a Doctor's certificate at the trial to prove that he received medical attention for several weeks (Pln.Exh. 72). That plaintiff's mail was constantly intercepted and most of the letters since he started the lawsuit against Tin Pan Alley were stolen, and those that he received were in a mutilated condition. That John Crawford testified in Court that he had sent two letters to the plaintiff which plaintiff never received and his landlady in the presence of Crawford denied ever having received. (Pln.Exh. 69 & 70)."

These things may have happened to the plaintiff or they may not, but assuming that they did happen, what do they prove against these defendants? Not one bit of proof that they had anything to do with it. He did not

know who attacked him. He did not know who, if anyone, stole his letters or ransacked his rooms or stole his papers and yet, on such facts as these, he asked me to find as part of the conspiracy that the defendants had something to do with intercepting his mail; that they caused him to be beaten by two gorillas and that they caused his room to be ransacked and manuscripts and letters to be stolen.

Again, he states in his brief: "That all such evidence was produced through witnesses and letters—not counting the circumstantial evidence, such as the concerts and professional engagements which were curtailed at Miami, the people who mysteriously disappeared from their own rooming houses after breaking into plaintiff's room, and all the jobs he lost in New York City for some mysterious reason."

There was absolutely no evidence, if these things occurred, that defendants had anything to do with them. Nothing from which even an inference or a suspicion might be drawn.

Again, in his brief, the plaintiff charges: "That the conspiracy extended even to the Court Room during the trial. Witnesses and Musicians were accosted by defendants attorneys and induced to disappear. That twenty-five (25) musicians from the Union who signed affidavits to the similarity of the Music, were given jobs in the Russian Ballet as an inducement for not testifying at this trial."

This is just another of plaintiff's immoderate statements, made without proof of any kind, except plaintiff's bald charge made during the trial.

On one of the early days of the trial he did charge that several of his witnesses were not present because the defendants had induced them to stay home. I sent for the men and one of them in the presence of the plaintiff stated that they were not present because plaintiff had told them to go home; that he would let them know when he wanted them.

Again he charges in his brief, as evidence, that a conspiracy existed: "Your Honor surely knows that the entire Press was suppressed after the first day's hearing, and one of the most sensational Exposes abruptly hushed up. All this costs a fortune, and why should people go to such length to cover up the truth? Innocent persons do not act thus and are quite ready to come out in the open, fearing no publicity."

I know nothing of the kind. I do know that this was the trial of a civil action between the plaintiff and the defendants in which he was asking, among other things, for an accounting and money damages. What the newspapers said or did not say about this lawsuit was of no consequence. This is a very good example of plaintiff's immoderate statements.

I agree with the plaintiff "That in a conspiracy a group of people act secretly and subtly, and it is difficult by direct proof to prove it. * * * A great deal is left for inference, to be most seriously considered and explored by the Justice."

There is absolutely no direct proof of any conspiracy; neither is there any evidence, fact or series of facts from which an inference might be drawn that any such conspiracy existed.

The plaintiff has drawn inferences which were unjustified and unwarranted.

For instance, with reference to the defendants' resting and failure to interpose any defense when the plaintiff rested, he states in his brief: "Plaintiff does not doubt the legal right of the defendants to rest without refuting him and trying to make it appear that plaintiff's case is not too strong, but I do doubt the justice of so doing. What inference may, can and must be drawn from such refusal to come out in the open to oppose? To plaintiff it is an inference conclusive and uncontradictory of his charges. The purposeful simultaniety in resting is a matter of profound significance for your Honor to consider. It refutes nothing. In fact, it makes plaintiff's evidence stand out like beacon lights in the distance. Plaintiff's evidence stand uncontradicted, and is overwhelmingly against the defendants."

It is academic to state that plaintiff is wrong and unjustified in his inference.

This disposes of some of the general charges of the plaintiff on the question of conspiracy. Because of the seriousness of the charges, I shall refer to some specific charges against specific defendants. Plaintiff charges that ASCAP "has by virtue of its license agreements with these places collected royalties for such performances, but has not paid complainant any part thereof nor has it accounted to him therefor"; that ASCAP has conspired with the other defendants: (1) to keep his works out of all programs, (2) from publishing any of his songs; that by reason thereof plaintiff was deprived of a living; that all of the defend-

ants, together with the ASCAP, "entered into the conspiracy * * * to plagiarize complainant's songs"; that officers of AS CAP conspired with others to keep the plaintiff out of the music profession and help the plagiarism of his songs; that plaintiff's songs were plagiarized by members of the ASCAP et al.; that the National Broadcasting Company program supervisors, music directors and artist bureau are controlled by the officers of the ASCAP and MPPA and were ordered not to perform complainant's songs.

The plaintiff produced no evidence which sustains these charges. Neither did he produce any testimony from which a fair inference could be drawn that these charges were true.

One of plaintiff's main contentions against ASCAP was that he had applied for membership, was fully qualified and that they unjustifiedly refused to admit him to membership. The following quotation from the plaintiff's brief fairly sets forth his claim in this respect: "That although he has been a composer of music for the last forty years, and his music has been performed for profit in thousands of public places where the ASCAP is the sole collector of royalties, by barring plaintiff from membership the ASCAP was able to keep all the royalties so collected, without any responsibility to plaintiff. The argument that they have such right to exclude plaintiff is erroneous."

The plaintiff is in error in this respect.

The American Society of Composers, Authors and Publishers (herein referred to as ASCAP) is a voluntary, unincorporated association, organized under the laws of the State of New York. It is really a collection agency for its members, who assign to it the playing rights or so-called minor rights of their compositions and the ASCAP, by the system they use, compel users of such compositions, to pay a royalty for the use of these compositions. They collect from radio broadcasters, hotels, dance halls, and other places of entertainment in this country, by a system of licenses which they impose for the public playing of the compositions of the members of ASCAP and the money is divided after certain sums are taken out among the composers, according to the rules of ASCAP.

The plaintiff made at least two attempts to join this organization; both times he was refused. He claims they have to take him in because of his record and because of the songs and musical compositions he has written, and which were so publicly performed as he claims he has proven.

It is not necessary for me to go into the reason for the refusal of ASCAP to accept the plaintiff as a member. It is expressed by them in their letter to plaintiff, dated February 29, 1932 (Plaintiff's Exhibit 59): "Please be advised that up to the present time the Membership Committee is of the opinion that your catalogue has not shown sufficient activity to warrant favorable action."

I find that he was not kept out of the Society by reason of any conspiracy or plan to deprive him of making a living.

They say that he is not qualified as a composer; that he has not composed any works that have any value to ASCAP; that he does not own the performing rights in most of the works that he wrote and that they were justified in rejecting him from membership.

It is not necessary for me to go into this, because I find that ASCAP is a private association; that its rules and by-laws define the manner and means upon which it admits composers to membership; that no one has an absolute right to be a member; that it has the sole power to say who shall belong and who shall not. That refusal to admit plaintiff to membership is not an invasion of his rights and gives him no right of action against ASCAP thereby.

The plaintiff has made charges against other of the defendants specifically which should be disposed of at this time. It will not be necessary to refer to all of the charges against all of the defendants because this has been covered before and can be covered by the general statement that I am unable to find from the evidence, the fact that a joint conspiracy existed between the defendants herein against this plaintiff as charged in the complaint and the bills of particulars.

The defendant, The Music Publishers Protective Association, is charged under Paragraph "Fourteenth" of the complaint as follows: "That the MPPA in cooperation with the ASCAP unlawfully, maliciously and with intent to prevent complainant from pursuing his career as composer of music has conspired with the other defendants (1) Not to publish any of his songs, (2) To plagiarize all songs

submitted to them by complainant, (3) And have induced all program supervisors, orchestra leaders and singers to exclude complainant's music from all programs."

Paragraph "Fifteenth" of the complaint reads: "That their former Managing Director, John G. Paine in cooperation with the other defendants retained all of complainant's attorneys and caused them to drop his suits."

Paragraph "Sixteenth" of the complaint reads: "That the officers of said MPPA have plagiarized complainant's songs, and have committed other unlawful acts against him."

There is no evidence in the case to sustain any of these allegations, either direct evidence or by inference.

There is another paragraph in the complaint which reads as follows: "Twenty-First: That M. Wattenberg and Edwin H. Morris have besides plagiarizing complainant's songs conceived the plan to brand the complainant as a lunatic spreading malicious lies against his character and have retained most of his attorneys and caused them to drop his cases."

The plaintiff made this assertion during the trial and testified to it himself by simply stating the fact as alleged in the complaint, but he offered no proof in any way which sustained these charges. He did put on the stand, several attorneys whom he claims, took his case and then later dropped him, his inferences being that, in some manner, they were induced to drop the charges by the defendants or the ones charged in the complaint as aforesaid. None of these attorneys who were called by the plaintiff, or any of the letters offered in evidence, sustained this contention. Two of the examples should be cited at this time. One was Arthur Garfield Hays, Esq. Plaintiff claims that he was induced to drop his case by the defendants or at lease one of them in an improper manner and for some improper consideration.

Mr. Hays, an attorney of some years, was put on the stand by the plaintiff and various of his letters were offered by the plaintiff, but nothing was introduced which, in any way, might cast suspicion upon the character or integrity of Mr. Hays. He gave a reasonable and plausible explanation of why he did not take the plaintiff's case. There was another attorney, Ralph Saron, who had been a family friend of the plaintiff. He was put on the stand by the plaintiff and he gave a very reasonable explanation of why he gave up plaintiff's case. He stated that it was for a financial reason and he told the reason. The plaintiff's contention, as he stated in court and as his brief indicates, is that after Mr. Saron visited the office of A. M. Wattenberg, he was induced to drop the case and then he states that Saron "mysteriously went into business right after he visited A. M. Wattenberg * * *." The inference he asks me to draw from this is that Wattenberg or someone else of the defendants, induced Mr. Saron to drop the case, and set him up in another business.

From a perfectly innocent state of facts plaintiff, without any evidence, is asking that sinister inferences be drawn.

The charges of conspiracy against the Song Writers Protective Association have been sustained in no way, neither by direct testimony nor by inferences from evidence which was produced before the Court. He charges among other things, that the defendant, Song Writers Protective Association, joined with the other defendants whereby its members (named) and others were engaged and did plagiarize plaintiff's compositions. There is no such testimony in the record. These charges have not been sustained.

The charges against the National Broadcasting Company and the Columbia Broadcasting System are generally to the effect that they, for some reason or other, did not play his songs and musical compositions; that he submitted several of his copyrighted and published songs to them, but none of them were broadcasted. This may be entirely true, but nevertheless, the failure to broadcast his songs and musical compositions was not because of any conspiracy. There may be many reasons why they were not broadcast, none of which have to do with any conspiracy.

The plaintiff put on the witness stand, the librarian of the Columbia Broadcasting System, who testified that the plaintiff had brought him a number of songs, but the witness stated that he had nothing to do with having the songs broadcasted; that that was not his business.

With regard to the defendant, Nathaniel Shilkrit, I find that there is no evidence against him, which, in any way, would indicate that he was, either by inference or direct evidence, implicated in any conspiracy against this plaintiff, and there is not one iota of evidence that he did any so-called pirating of the plaintiff's musical

compositions. As a matter of fact, the plaintiff, in his demand for relief, in his complaint, asks for no relief against this defendant.

With regard to the defendant Emery Deutch, he was not served with the summons and complaint herein.

There are a number of allegations and charges in the complaint against other defendants which need not be mentioned at this time, as they have been disposed of under the general findings of fact herein.

A number of exhibits have been offered in evidence by the plaintiff, particularly letters which concern his former attorneys, but these letters in no way sustain his contention. There is nothing about them which is improper; nothing about them which would create a suspicion of wrongdoing or of meddling with his attorneys.

There is another charge which should be mentioned now, to the effect that several of the defendants conspired with other defendants to spread malicious lies about plaintiff whenever he tried to find employment. There is absolutely not one iota of evidence to sustain this contention. Neither is there any evidence from which a fair inference can be drawn to that effect.

The same thing applies to the charge against several of the defendants "that the other defendants and their attorney conceived a plan of branding complainant as a lunatic". There is nothing in the case which sustains this, and there never was any question about this raised, except with one witness, Louis Diamond, President of the Paramount Music Corporation, who testified that he thought the plaintiff was demented and that is why he did not publish his music. Upon this statement alone, which was entirely the witness's own personal opinion apparently, the plaintiff urges in his brief that this is evidence, among other things, of his claim of conspiracy. This is another of the improper inferences which plaintiff has drawn from testimony.

The plaintiff, in addition to the charge of conspiracy, has accused certain of the defendants with plagiarism of some of his copyrighted songs, as follows:

(1) He claims his song "I Only Want To Prove How Much I Love You", copyrighted by plaintiff on August 11, 1933, was plagiarized by defendant Sam Fox Publishing Company, by its song "The World Is Mine To-Night", copyrighted in 1935.

(2) That his song, "Whisper To Me", copyrighted by plaintiff in February, 1932, was plagiarized by the defendant M. Witmark & Sons by its song "My Wishing Song", copyrighted later in 1932.

(3) That his copyrighted song "Celestial Melody" and/or "Ave Maria", was plagiarized by defendant Broadway Music Publishing Corporation by its song "Be Still My Heart".

(4) That his songs, "Where Are You Now", and "I Love You Madly", were plagiarized by defendant Mills Music Company by its song "Take Me In Your Arms."

(5) That his musical composition, "A Mother's Prayer", originally copyrighted by plaintiff in 1899, later renewed, was plagiarized by defendant Harms, Inc., by its song "Bei Mir Bist Du Schoen".

At the commencement of the trial, it appeared that there was an action already pending in this Court by the plaintiff herein against the defendants, Harms, Inc. and Warner Brothers Pictures, Inc., for the alleged plagiarism of the said musical composition of plaintiff entitled, "A Mother's Prayer", by the publisher of the song "Bei Mir Bist Du Schoen".

At the opening of the trial, the attorney for the said defendants, moved to consolidate the second action with this action. Upon the consent of the plaintiff, an order to that effect was made.

Before discussing the alleged plagiarisms of plaintiff's songs and musical compositions by the various defendants charged therewith, three of the above may be disposed of now: (3) Plaintiff's song "Celestial Melody" and/or "Ave Maria"; defendant Broadway Music Publishing Corporation's song "Be Still My Heart". In his brief which has been signed personally by the plaintiff, he states: "The only song which was not submitted to the publishers is 'Celestial Melody' or Ave Maria. Although the chorus of their publication 'Be Still My Heart' is very much the same as plaintiff's song, there is a reasonable doubt (of which there is none in the other songs) whether Jack Eagan has seen the back page of 'A Mother's Prayer' or a copy of Ave Maria.

"His testimony in Court seemed honest and sincere and because of that fact, the plaintiff does not wish to press the charges against him and 'Be Still My Heart.'".

Therefore, it will not be necessary for me to consider these two songs further, except to state that, in my opinion, plaintiff failed in his attempt to prove infringement of the copyright of his said song by the song published by the defendants. It appeared during the trial that the composer of the song "Be Still My Heart" was Jack Eagan; that he wrote and composed the song in 1934; that he had never heard of plaintiff's said musical composition; that he thought his song was original when he wrote it, but later found that he had copied parts of this song from several others of his own compositions written prior to plaintiff's song. I agree with the plaintiff that the composer of this song seemed honest and sincere while on the witness stand. There was no satisfactory proof of access, either to the defendant charged with plagiarizing this song, or to the composer, who is not a defendant.

(5) Plaintiff's musical composition "A Mother's Prayer"; defendants song "Bei Mir Bist Du Schoen". It will not be necessary for me to discuss the merits of these two songs and their similarity, because of plaintiff's title, or rather lack of title, to the musical composition entitled "A Mother's Prayer".

The defendants have proven beyond any question of doubt, that the plaintiff, long prior to the commencement of this action, and prior to the publication of defendants song, that he had parted with all the right, title and interest and ownership of his said musical composition. I find from documentary and other evidence, that the plaintiff had no title to "A Mother's Prayer" which would give him a cause of action, even assuming that there was an infringement of the copyright to "A Mother's Prayer". There is no question but what the plaintiff was its composer and that he originally copyrighted it in 1899, and that in June, 1926, the copyright having expired, he made application for a renewal and received a certificate therefor. He himself testified that he sold his said composition and the copyright therein, to Theodore Lohr, in 1899 or 1900, but that the copyright having expired, he took out a renewal certificate and that Mr. Lohr had no further interest in the copyright. He further testified that in 1926, he, the plaintiff, assigned this copyright to Albert Terres. He stated, however, that this copyright was for the life of Mr. Terres only, but the plaintiff did not produce and was unable to produce any document sup-

porting that, and the proven facts do not support him.

The original assignment was offered in evidence by the defendants (Defendants Exhibit E-3), the exhibit being a photostatic copy, certified by the Copyright Office, of the record in the Copyright Office at Washington, the document being dated November 11, 1926. This is an unconditional assignment.

The proof shows that the plaintiff signed the original. Plaintiff stated that he was paid $3,000. for the assignment. The preparation of the assignment and the signing thereof by the plaintiff, was testified to by an attorney who was in the office of the lawyer who prepared the assignment and was present when plaintiff signed it and testified that the plaintiff signed the original assignment and that it was sent to the Copyright Office for recording and that he, the witness Eckstein, took the acknowledgment of the plaintiff herein to said assignment. He also produced letters from the files at the office; he produced a conformed copy of the assignment; all of which clearly proves that for the above sum, the plaintiff had assigned all his right, title and interest in and to the musical composition "A Mother's Prayer" to the said Terres, unconditionally.

In further corroboration of this fact, after the death of Mr. Terres, the executors of his estate assigned the said copyrights owned by the said Terres to Daniel H. Greenberg. Other documentary evidence clearly indicates that the plaintiff was not, at the commencement of either of these two actions, the owner of the said composition and had no title to it in any way, which would be actionable in the event of plagiarism.

Plaintiff further claims that in 1931 he copyrighted a new and more difficult arrangement of the original musical composition entitled "A Mother's Prayer". However, the records of the United States Copyright Office do not reveal any such copyright being issued to this plaintiff at that time (Defendant's Exhibit D-3).

(4) Plaintiff's song "Where Are You Now"; defendant Mills Music Company's song "Take Me In Your Arms". During the trial, I disposed of this issue.

On motion of the attorney for the defendant Mills Music Company, I dismissed that cause of action against defendant Mills Music Company, but allowed plaintiff to

continue against the defendant on the charge of conspiracy.

In connection with the charge of conspiracy, since I have found that there is no evidence of any kind from which a conspiracy might be inferred, it is not necessary for me to discuss any alleged similarity of plaintiff's two songs and the song published by the defendant.

■■ I now take up the two remaining songs of plaintiff which he claims have been plagiarized. Before commenting upon the alleged infringement and plagiarism claimed by the plaintiff, I shall discuss briefly the rules applicable to a case of this kind, and the rules which I have followed in my determination of these issues.

"Every such suit turns upon two fundamental problems—the existence of a copyright protecting an original work and the infringement of the right, through copying.

"Ultimately, the determination of these two problems turns on the issues of originality, access, and similarity." Hirsch v. Paramount Pictures, Inc., et al., D.C., 17 F.Supp. 816, 817.

■ The plaintiff has proven the existence of copyrights protecting his two songs. The issue thereupon resolves itself to originality, access and similarity of plaintiff's songs with defendants' songs.

"* * * independent reproduction of a copyrighted musical work is not infringement; nothing short of plagiarism will serve." Arnstein v. Edward B. Marks Music Corporation, 2 Cir., 82 F.2d 275.

"* * * the plagiarism of any substantial component part, either in melody or accompaniment, would be the proper subject of such a suit as this. To sustain it, however, more must appear than the mere similarity or even identity, of the supposed infringement with the part in question. In this lies one distinction between a patent and a copyright. One may infringe a patent by the innocent reproduction of the machine patented, but the law imposes no prohibition upon those who, without copying, independently arrive at the precise combination of words or notes which have been copyrighted." Fred Fisher, Inc., v. Dillingham et al., D.C., 298 F. 145, 147.

■ Using these rules as a measure, and for the further reasons which I have set forth below, I find that the plaintiff has not sustained the burden put upon him by the law for these cases, and that he has not sustained his charges of the plagiarism and infringement of his copyrighted songs, by the songs of the two defendants charged therewith.

The plaintiff, as stated before, was not represented by an attorney. I allowed him great liberality and much time in presenting his case. Various parts of the different songs were placed upon the blackboards; musical experts were produced on both sides. The songs were sung and played, and all of the songs in dispute were gone into very thoroughly and at length. True, the experts differed greatly. Nevertheless, they were an aid to the Court.

The plaintiff claims that there was an infringement of his copyright and a plagiarism of his song, "Whisper To Me", by the song of the defendant M. Witmark & Sons, "My Wishing Song", which was copyrighted and published subsequent to the copyrighting and publication of plaintiff's song.

Plaintiff claims, in an attempt apparently to prove access to the publisher, said defendant M. Witmark & Sons, that he submitted this song to the said defendant; that he played his song to one Piantodosi, who was then in Witmark's employ; that Piantodosi was interested in the song, but one Edward B. Morris came into the room and motioned to Piantodosi and shook his head "No"; that as Arnstein went out, he met one Janpolsky; that he played his song for him and Janpolsky went out with Edward B. Morris, having in his possession at that time, plaintiff's song, and when Janpolsky returned to the room, he no longer had the copy of the song with him.

At the trial, plaintiff, in his testimony, drew the inference that Morris had taken the song away from Janpolsky, Morris being connected with the said defendant and that thereby and by reason thereof, the defendant M. Witmark & Sons came into possession of plaintiff's song. He charges that within four months thereafter, defendant published its song which he claims was an exact copy of "Whisper To Me".

There is no question but that this last statement is not correct, because it is clearly apparent from the analysis of the two songs and from the rendition thereof, that the second one is not an exact copy—or anywheres near it—of the first song.

Plaintiff stated that he had known Morris and had had trouble with him before. Yet, when Morris was produced in the courtroom, and confronted the plaintiff, the plaintiff stated that he was not the man and

that he must have been mistaken as to the name. Who the man is, no one seems to know. Janpolsky was not produced by the plaintiff, and the plaintiff, in his brief, charges that the defendants induced Janpolsky to ignore plaintiff's subpoena. There is no testimony to support this charge.

He also charged the defendants with withholding any information as to the whereabouts of Mr. Piantodosi. This statement is not correct. I personally endeavored to have Mr. Piantodosi produced, but no one, including the plaintiff, seemed to know his whereabouts.

As opposed to this, it was testified to by witnesses for the defendants, that the composer of defendants' song "My Wishing Song" was Joseph A. Burke; that he had been a composer of music for twenty-five years. There was introduced, a list of songs which he had composed; some two hundred and fifty in number, many of which were rather popular songs; that he had not been and was not in the employ of the defendant M. Witmark & Sons; that he had never seen or heard of plaintiff's song until about a month before the trial; that he had written his song in September, 1932. He appeared to be a very honest witness. I would hesitate to say that he committed perjury, which it would be necessary for me to do, were I to find that in writing his song, he had copied or used a substantial portion of plaintiff's song.

As to the originality of plaintiff's song, this has been questioned by the defendants and they produced another song, written and copyrighted prior to the song of either plaintiff or defendant; to wit, the song "Are You Lonesome To-Night" (Defendant's Exhibit W-2), concerning which it was testified that it had been a very popular song in 1927 and 1928. There appeared to be a great deal of similarity between all three songs. Plaintiff's expert witness, Mr. Eugene Plotnikoff, testified that all three songs were similar in the first eight measures. Mr. Plotnikoff appeared to me to be an excellent musician; he made an excellent witness. He stated that there was a great similarity between plaintiff's song and the song "Are You Lonesome To-Night," further stating that the melody in all three songs was the same.

Another expert witness for the plaintiff, Mr. Sapiro, testified that there was similarity between the three songs.

The expert witnesses for the defendant testified as to the similarity of the three songs, but insisted that there was greater similarity between plaintiff's song and the third song (Defendant's Exhibit W-2), than there was between defendant's song and plaintiff's song.

Other songs and parts of songs were produced and shown by defendants to show common ancestry. Under all the circumstances, it seems, on the question of originality, that one might apply the same rule to both plaintiff's song and defendant's song, and come to the same conclusion. Each composer claimed his song was original; yet, there were proven, other songs of prior date, with similar notes and similar progression of notes, so that either might be original or might not be original, with just as much right to consider the defendant's song original as the plaintiff's song, particularly when the test of originality is applied, as stated in the Hirsch case, D.C., 17 F.Supp. 816, 817: "In determining the originality of a popular song, we are confronted with the fact that it is built upon a rather simple, accepted pattern. It has, as a rule, three parts in the chorus: The opening strain, which usually runs for eight bars and is repeated for another eight bars, a middle tune of eight bars, and a concluding eight bars, which repeat the first strain. Shafter, Musical Coypright, pp. 155, 161, 166, 171. Similarity of tone succession, which is, to a certain degree, inevitable in all musical compositions, because of the limits of the chromatic scale, is more likely to appear within this narrow pattern. So that, if, as Judge Hand has stated, Fred Fisher, Inc., v. Dillingham (D. C.N.Y. 1924) 298 F. 145, a musical composition is original if it is 'the spontaneous, unsuggested result of the author's imagination,' originality in the realm of popular music lies within a very narrow scope. Slight variations in the use of rhythm, or harmony—of accent and tempo—may achieve it." Hirsch v. Paramount Pictures, Inc., et al., D.C., 17 F.Supp. 816.

The plaintiff's main contention and effort during the trial was to show similarity between his song and the defendant's song. He claimed that the defendants had taken and practically copied sixteen measures of his song in progression; that the first eight measures are exactly similar or identical, as he pointed out, and the second eight measures are not quite so identical,

but are similar. He produced several expert witnesses; Mr. Plotnikoff, who testified that there was similarity between the songs, that neither of them were great compositions, that some of the notes were identical and others were almost the same. To a certain extent, he corroborated the plaintiff. Mr. Sapiro, an expert witness for the plaintiff, played the songs on his violin. He stated that there were sixteen notes exactly alike. Plaintiff placed parts of the songs on a blackboard and compared them. There seemed to be similarity, particularly in the melodic line. The defendant produced two expert witnesses, Mr. Spaeth and Mr. Clark, who testified as to what similarity they claimed there was.

I do not propose to enter into an analytical discussion of the intricacies of the notes claimed to be similar and identical and the parts of the songs claimed to be similar and identical. The testimony adduced on the part of the plaintiff is disputed materially. Mr. Clark, who was produced as an expert witness on behalf of the defendant, was complimented by the plaintiff when he was on the witness stand when he told him, during his cross-examination, that he was a good musician and understood music. Mr. Clark testified that he had studied music at Princeton, that his profession was that of music, that he had studied music, composed songs and written books about music and taught music. He stated that he found no similarity between defendant's and plaintiff's songs; that they were entirely different in spirit and effect upon the listener; that there are no essential similarities; that there was an apparent similarity in the raw material which is open to everyone; that there was a sequence of seven notes in both songs, but that was not original with either; that the three last bars were very similar, but they were what is known as an incomplete cadence, which was an extremely common thing, and used by many composers.

I have come to the conclusion, after reading the testimony and hearing the songs played, and sung, and dissected and analyzed by the experts, that there is a similarity in the melodic line, but not such a similarity as amounts to identity or to constitute copying. While there is a similarity of notes in some respects, as testified to by all of the witnesses, yet, there are many differences; for instance, plaintiff's composition is a sort of a ballad with a trend toward syncopation. Defendant's song is a smooth waltz song. Although there is similarity in the melodic line, there is also a marked difference in parts which are not similar. The phrasing of the songs is different. The basic feature of plaintiff's song is a four-note phrase and the basic feature of the defendant's song is a four-note phrase, but rhythmically opposite to the plaintiff's.

In analyzing and considering the two songs, the similarity of the melodic line and the dissimilarities therein, and the other dissimilarities between the two songs, it seems to me that the plaintiff has not met the test as laid down in the cases hereinbefore referred to.

Plaintiff, in his complaint, charges the defendant Sam Fox Publishing Company with an infringement and plagiarism of his copyrighted song "I Only Want To Prove How Much I Love You", by the song published by the defendant, "The World Is Mine To-Night". As with the previous songs, plaintiff used blackboards, with portions of the songs thereon, to show similarity. During the trial plaintiff included another song which he claims was plagiarized by defendant's song; to wit, his (plaintiff's) song "Light My Life With Love".

With regard to the first song (I Only Want To Prove How Much I Love You), plaintiff testified, and there was no question raised about it, that he had submitted a manuscript of this song to the defendant sometime in 1934, and the same was subsequently and within a short time thereafter returned to plaintiff by the defendant.

The defendant, Sam Fox Publishing Company, is not the composer of the song "The World Is Mine To-Night", but the publisher thereof. Defendant's song was not published until a year after the above incident. The testimony is that defendant's song was composed by an English composer, the song being first published and copyrighted in 1935 by Keith, Prowse & Company, Ltd., an English publishing house, the composer being one George Posford; that defendant had acquired the American publication rights and pursuant to a license obtained, thereby published the song in the United States.

Under all these circumstances, it is extremely doubtful that access has been

proven. As a matter of fact, the plaintiff has not met the burden of proving access as far as this defendant is concerned. The song was composed by George Posford, an English composer, and was published and copyrighted originally in England; true, subsequent to the copyrighting of plaintiff's two songs. There is no testimony in any way connecting the composer of the song and the English publisher, with the plaintiff or his songs, or any intimation that they had ever heard or seen either song. As far as the second song is concerned, there was no proof that this defendant, Sam Fox Publishing Company had ever seen or heard plaintiff's song "Light My Life With Love".

The plaintiff's answer to this is that it is a trick on the part of the defendant; that this whole thing was a subterfuge; that it was not an honest transaction, but done for the purpose of effecting the infringement and plagiarism of his song. He further stated on cross-examination that "George Posford did not write that song". Of course there is no proof of this contention of the plaintiff. On the contrary, it was testified by one witness for the defendant, that he knew George Posford, and five of his (Posford's) songs claimed to have been written by him were offered in evidence. It was also testified that he was in the employ of the English house. Under all the circumstances, I do not feel that there has been access fairly proven here.

The plaintiff's contention is that there is a marked similarity between the song published by the defendant, "The World Is Mine To-Night", and his two songs, "I Only Want To Prove How Much I Love You" and "Light My Life With Love". As stated before, the parts of the various songs were placed on the blackboards, and there did seem to be similarity in quite a number of notes as placed on the boards, but there were some notes, not at first placed on the boards, which were later put on.

Plaintiff claimed: "Now I won't prove that they have taken a phrase of mine, but I want to prove that they took the entire song and that they got tired of this song and that they could not use it any more and that they went to another song of mine". The plaintiff's claim is extravagant in this respect. The two main songs are not identical. As I stated before, there was similarity in the notes, not suffi-

cient, I believe, to constitute identity or such similarity which constituted plagiarism, particularly in view of the rules which I have heretofore laid down, and along the lines laid down by the Hirsch case, supra.

The plaintiff did produce three expert witnesses; one a concert singer, who testified that the melodies were alike with few exceptions; the other, David Sapiro, a musician, who testified to similarities between the plaintiff's two songs and the defendant's song, the similarity being, as he stated, in the melodic outline.

He also had as his witness, Eugene Plotnikoff, a musician and conductor. He testified that the songs are similar. He also stated that there is no question but that between the two main songs, there was a similarity in the melodic line, but when the songs were played, there did not seem to be any great similarity, to the average listener.

All three songs, it seems to me, could have been played on the same program and there would be no suspicion that they were the same song or almost identically the same, as claimed by the plaintiff.

Mr. Plotnikoff testified as follows:

"Q. There is a difference in rhythm? A. Yes.

"Q. There is a difference in tempo? A. Tempo, just the same. Here is a melodic tempo, the tempo of a waltz.

"Q. You mean to say with respect to the same 16 measures which you say are alike— A. Yes.

"Q. That has a difference in notes? A. Yes.

"Q. Difference in rhythm? A. I said very similar.

"Q. Difference in emphasis? A. Certainly. I said in the beginning that the song is different."

Defendant produced other expert witnesses, one of whom was Arthur McKay, a producer of music, who was in the employ of the defendant, and who was informed by the plaintiff, while he was on the stand: "I see you know something about music." This witness analyzed the songs, and his testimony was to the effect that the songs were entirely differently constructed, different in rhythm, different

in harmony; that there was no parallel in any instance.

There was a sharp conflict in the testimony as to the similarity in the songs, and while there appeared by analysis that there was similarity in the melodic line and of some notes, yet there were so many differences that, considering all of the facts surrounding the publications of defendant's song, lack of access, it seems to me that there is no such similarity here, as would constitute infringement and plagiarism.

It is not necessary for me to decide the originality of the two songs, because I have come to the conclusion that the plaintiff has failed to meet the burden to prove access to the defendant and that there was not such similarity in the songs to constitute plagiarism and/or infringement.

For the reasons stated above, the complaint should be dismissed with costs, but without counsel fees.

Counsel for the defendants must prepare and submit to me through the Clerk's office, findings of ultimate facts and the simple conclusions of law herein indicated in pursuance of Rule 52(a) of the Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c, in accordance with this opinion. I do not want any details of evidence submitted as the findings of ultimate facts.

All proposed findings of fact and conclusions of law submitted to me must be typed in triple spacing so that I may conveniently correct them if I wish to do so.

Counsel for the defendants must give five days' notice of their proposed findings of fact and conclusions of law to the plaintiff.

Plaintiff, if he be so advised, may on the return day of such notice, submit to me and serve on the defendants' counsel criticisms of the findings of fact proposed by the defendants' counsel.

As under Rule 52(a) only findings of fact and conclusions of law which I sign will be filed as part of the record herein, I suggest this course for the plaintiff because counter findings will not avail him anything. He must take his objections, if any, to my findings by way of appropriate assignments of error on any appeal which he may take.