## ASSOCIATED PRESS v. EMMETT.

### No. 1926–Y.

District Court, S. D. California,
Central Division.

June 19, 1942.

Cosgrove & O'Neil, Roscoe C. Andrews, and Samuel H. Rindge, all of Los Angeles, Cal., for plaintiff.

James E. Neville, of Los Angeles, Cal., for defendant.

YANKWICH, District Judge.

The motions involve three questions. First, the question of jurisdiction. Then, arbitrariness and unilaterality of the By-Laws, and, especially, of the sections relating to withdrawal. And, finally, the invalidity of the provision for liquidated damages, which might, also, result in the court lacking jurisdiction of the case.

The two latter grounds are also urged as grounds for refusing recovery. One of the first things we learn when we come to this bench from the state trial courts is that, despite what we or the Bar may think about our position, we are merely *federal justices of the peace,* in that there is no *presumption* in favor of the jurisdiction of our court.

As Mr. Justice Harlan said in Lehigh Mining & Manufacturing Company v. Kelly, 1895, 160 U.S. 327, at pages 336, 337, 16 S.Ct. 307, at page 311, 40 L.Ed. 444: "But when the inquiry involves the jurisdiction of a federal court,—the presumption in every state of a cause [is] that it is without the jurisdiction of a court of the United States, unless the contrary appears from the record."

In United States v. Green, 9 Cir., 1939, 107 F.2d 19, at page 22, Judge Garrecht says: "The District Courts of the United States are courts of limited jurisdiction, and the presumption at every stage of a cause is that the cause is outside the jurisdiction of a court of the United States unless the contrary appears from the record."

But this is not all. The Judicial Code has made it the continuing duty of the judge of a District Court to inquire into jurisdiction, whether he has before him a case begun in his court or one removed to it. This is the well-known section 37 of the Judicial Code, which is codified as Section 80, 28 U.S.C.A.

Mr. Chief Justice Hughes, in McNutt v. General Motors Acceptance Corporation, 1936, 298 U.S. 178, at page 189, 56 S.Ct. 780, at page 785, 80 L.Ed. 1135, has interpreted this duty. The opinion says: "The prerequisites to the exercise of juris-

diction are specifically defined and the plain import of the statute is that the District Court is vested with authority *to inquire at any time* whether these conditions have been met. They are conditions which *must be* met by the party who seeks the exercise of jurisdiction in his favor. He must allege in his pleading the facts essential to show jurisdiction. If he fails to make the necessary allegations he has no standing. If he does make them, an inquiry into the existence of jurisdiction is obviously for the purpose of determining whether the facts support his allegations. In the nature of things, the authorized inquiry is primarily directed to the one who claims that the power of the court should be exerted in his behalf. As he is seeking relief subject to this supervision, it follows that *he must carry* throughout the litigation the burden of showing that he is properly in court. The authority which the statute vests in the court to enforce the limitations of its jurisdiction precludes the idea that jurisdiction may be maintained by *mere averment or that the party asserting jurisdiction may be relieved of his burden by any formal procedure.* If his allegations of jurisdictional facts are challenged by his adversary in any appropriate manner, he must support them by competent proof. And where they are not so challenged the court *may still insist* that the jurisdictional facts be established or the case be dismissed, and for that purpose the court may demand that the party alleging jurisdiction justify his allegations by a preponderance of evidence."

■■ The trial court need not wait until the cause is tried. It may, upon affidavits or evidence *dehors* the record, before trial, determine the absence of jurisdiction, and thus, never enter upon a trial of the cause. Acquiescence or even stipulation of counsel, oversight or a positive finding on the part of the court, will not help, if, in fact, jurisdiction does not exist.

■ If the question be not raised in the lower court, it may be raised, for the first time, by either litigant or by the court, on appeal. More, the litigant, who invoked the court's aid, may, if dissatisfied with the judgment, challenge its jurisdiction, and, if successful, snatch victory from defeat.

My own experience in Kataoka v. May Department Stores Company, 9 Cir., 1940, 115 F.2d 521, is illustrative. Kataoka, a Japanese minor, through his guardian ad litem, brought an action for injuries suffered while he was playing at the foot of an escalator in the defendant's store. His right hand was caught in the plate at the bottom of the escalator, and the ends of several fingers were crushed. He invoked the jurisdiction of the court, presumably, upon the theory that there was a separable controversy between the plaintiff and the employee, who was charged with negligence, and the plaintiff and his employer, The May Company, a foreign corporation. At that time, the Supreme Court had not yet decided a case which originated in my court, and in which it ruled that separability does not exist under such circumstances.[1] The case was tried. The question of jurisdiction was not raised. I decided in favor of the defendant, on a motion for non-suit, in which I held that there was no evidence of negligence, and that the doctrine of attractive nuisance did not apply to escalators. The plaintiff filed a motion for a new trial. Before this motion was heard, the plaintiff employed new counsel, who averred, *for the first time,* that I had no jurisdiction to try the case. I wrote an opinion, denying the motion upon the ground that there was a separable controversy and that, having granted a non-suit, the judgment of dismissal which followed was a dismissal for all purposes. And that it could be argued later, if the plaintiff desired to sue in the state courts, that the dismissal did not bar him[2]. I relied, as to the latter point, on a decision of the Fifth Circuit Court of Appeals[3], to the effect that, if a court had dismissed a case upon an unjustifiable ground, the dismissal would stand, if it could have been granted on another (and justifiable) ground. But our Circuit Court of Appeals sent the case back to me with direction to redismiss it.

---

[1] Pullman Company v. Jenkins, 1939, 305 U.S. 534, 59 S.Ct. 347, 83 L.Ed. 334. That there was confusion on this subject is indicated by Dobie on Federal Procedure, Sec. 95, especially pages 379–381.

[2] My original opinion is Kataoka v. May Department Stores Co., D.C.Cal.

1939, 28 F.Supp. 3. The supplementary opinion on the Motion to Dismiss the Proceedings for Lack of Jurisdiction is Kataoka v. May Department Stores Co., D.C.Cal.1939, 30 F.Supp. 346.

[3] McCaskill Co. v. Dickson, 5 Cir., 1908, 159 F. 704.

*This time for lack of jurisdiction.*

We have, therefore, a situation where the losing party, after having invoked the court's jurisdiction, extricated himself out of defeat by challenging the jurisdiction of the court into which he had come for relief.

Soon after, another case arose, Atchison, T. & S. F. R. Co. v. Francom, 9 Cir., 1941, 118 F.2d 712. This was an action for damages for death, begun in the Superior Court for Los Angeles County, California, against the railway company and two of its employees. It was removed to the District Court on motion of the railway company. A motion by plaintiffs to remand to the state court was denied. Trial resulted in a verdict for $35,000 against the railway only. On appeal, the railway company insisted that the removal, *which it had sought and obtained from the state court,* was erroneous as there was no separable controversy. The court held that, although the railway company *had sought removal and had opposed remand,* the case was within the jurisdiction of the state court. It, therefore, reversed the judgment upon the ground that the District Court never acquired jurisdiction to hear and determine the matter.

*More recently, another case arose,*— Cheyne v. Atchison, T. & S. F. R. Co., 9 Cir., 1942, 125 F.2d 49. In that case, an action for damages for death, brought in the state court against the same railway company and three of its employees, was removed, *on motion of the railway company,* to the District Court. Trial in the district court resulted in a verdict of $12,500 for the plaintiff against the railway company only. On motion of the railway company, the judgment against it was set aside and judgment entered in its favor. The parties, on appeal, *did not* question the correctness of the removal. *But the court did.* And it reversed the case and remanded it to the District Court with directions to remand it to the Superior Court for Orange County, California.

These cases illustrate the rigour with which the higher courts apply the rule which denies us presumption of jurisdiction. And it matters not whether the challenge to jurisdiction involves diversity of citizenship or relates to the jurisdictional minimum. As to neither, will they allow stipulations to take the place of proof.

A case involving the constitutionality of an ordinance of the City of Los Angeles, levying a tax on oil of certain gravity, came before me, on a stipulation that the ordinance, if enforced, would require the payment of a tax and penalties over $4,000 during the year.

Jurisdiction was, thus, conceded. The sole question I was asked to decide was, whether the ordinance was constitutional. This I did. The case went to the Circuit Court of Appeals. None of the litigants questioned jurisdiction, on appeal. But the court did. And it held that, because penalties had been added to the demand, the jurisdictional minimum did not exist. Again I received directions to dismiss the case.[4]

I cite these cases, many of them out of my own experience as a trial judge, in order to emphasize the rigour in the application of the principle that there is no presumption that we have jurisdiction. Add to this Section 37 of the Judicial Code, which bids us inquire into jurisdiction at all stages of a case, and you can see the importance of jurisdiction in any case coming before us.

The question of jurisdiction arises in this case in the form of a challenge to the plaintiff's right to recover liquidated damages. Liquidated damages, like any other damages, may form the basis of jurisdiction. The section of the Code, Subdivision 1 of Section 41, 28 U.S.C.A., which is the source of our jurisdiction in diversity cases, says that there is jurisdiction if the matter in controversy is between citizens of different states and the matter in controversy exceeds the sum or value of $3,000. The rule, generally followed in determining the existence of the jurisdictional minimum, is the value to the plaintiff of the right which he seeks to enforce.

Dean Dobie, who is now a Judge of the Fourth Circuit Court of Appeals, calls this "the plaintiff-viewpoint rule."[5] It is not always easy to apply. As a general proposition, we go back to an old decision of Mr. Justice Field in Smith v. Adams, 1889, 130 U.S. 167, 9 S.Ct. 566, 32 L.Ed. 895, which has been followed repeatedly by the circuit courts.[6] This is Mr. Justice Field's

---

4 See: Royalty Service Corp. v. City of Los Angeles, 9 Cir., 1938, 98 F.2d 551; . General Petroleum Corp. v. Beanblossom, 9 Cir., 1931, 47 F.2d 826.

5 Dobie on Federal Procedure, Section 56, p. 133.

6 The same view is taken by the Tenth Circuit Court of Appeals in Ronzio v.

language: "By matter in dispute is meant the subject of litigation,—the matter upon which the action is brought and issue is joined, and in relation to which, if the issue be one of fact, testimony is taken. It is conceded that the pecuniary value of the matter in dispute may be determined, not only by the money judgment prayed, where such is the case, but in some cases by the increased or diminished value of the property directly affected by the relief prayed, or by the pecuniary result to one of the parties immediately from the judgment. Thus a suit to quiet the title to parcels of real property, or to remove a cloud therefrom, by which their use and enjoyment by the owner are impaired, is brought within the cognizance of the court, under the statute, only by the value of the property affected." Opinion, 130 U.S. at page 175, 9 S.Ct. at page 569, 32 L.Ed. 895.

■■■ Now we come to Bergman v. Inman, Poulsen & Company, C.C.Or.1898, 91 F. 293, decided by District Judge Bellinger, on which the defendant leans heavily. That was an action brought to enforce a lien upon certain logs. The lien was sought under a judgment obtained in the State of Washington against certain defendants and assigned to the plaintiff, which was lumped with other claims to give the court jurisdiction. The statutory jurisdictional minimum then stood at $2,000. The prayer was for $2,858.75, for the conversion of the logs upon which the lien was claimed. The defendant was not a party to the Washington action. And the court held, for this reason, that the judgment could not be made the measure of the plaintiff's recovery in the action. The court said:

"Two questions are raised in support of the demurrer: First, that the amount in controversy necessary to give the court jurisdiction must be the amount claimed by the plaintiff himself, in his own right, and not including what is claimed in the right of his assignors; second, that admitting that the several assigned claims may be added together, and that their sum may constitute the amount in controversy, yet in this case, inasmuch as this amount aggregates only $1,962, the court is still without jurisdiction, notwithstanding the claim in the prayer for damages in the sum of $2,858.

"It is held that the assignee of choses in action aggregating over $2,000 may maintain a suit if his assignors were citizens of other states from the defendant, although they could not have maintained separate suits, because none of their claims amount to the sum required to give jurisdiction.[7] * * *

■■■ "As to the second point, the rule is well settled that, where the suit is upon a demand on which the law liquidates the damages, the amount so liquidated, and not the amount claimed in the plaintiff's complaint, constitutes the value of the matter in dispute. It is only where the damages are not limited by law that the amount for which the plaintiff demands judgment is to be considered in determining whether the requisite amount to give the court jurisdiction is involved in the controversy. In this case the plaintiff states with particularity the several claims or liens upon which must be based the amount of damages to which the plaintiff is entitled, and these, as we have already seen, aggregate less than $2,000. The amount claimed in the complaint is made up by adding to this sum interest and attorney's fees, adjudged in favor of the plaintiff in his suit in the Washington court; but since the parties here are not precluded by that adjudication,

---

Denver & R. G. W. R. Co., 10 Cir., 1940, 116 F.2d 604, 606, and by our own Circuit Court of Appeals in General Petroleum Corporation of California v. Beanblossom, 9 Cir., 1931, 47 F.2d 826.

[7] This is the principle of pooling of claims, under which separate plaintiffs may pool their separate demands in order to total the jurisdictional amount, when they join to enforce a single title or right, in which they have a common or undivided interest, *not distinct interests.*

The most common application of this norm is found in assignment cases. Assigned claims totaling the jurisdictional minimum will be entertained when the assignments vest actual title in the plaintiff and are not for collection or merely colorable. See: Crawford v. Neal, 1892, 144 U.S. 585, 12 S.Ct. 759, 36 L.Ed. 552; Brigham-Hopkins Co. v. Gross, C.C. Wash.1901, 107 F. 769; Kentucky Wagon Mfg. Co. v. Jones & Hopkins Mfg. Co., 5 Cir., 1918, 248 F. 272, 273; Black & White Taxicab & Transfer Co. v. Brown & Yellow Taxicab & Transfer Co., 1928, 276 U.S. 518, 48 S.Ct. 404, 72 L. Ed. 681, 57 A.L.R. 426; Bullard v. Cisco, 1933, 290 U.S. 179, 54 S.Ct. 177, 78 L.Ed. 254, 93 A.L.R. 141; First State Bank v. Chicago, R. I. & P. R. Co., 8 Cir., 1933, 63 F.2d 585, 90 A.L.R. 544. See my opinion in Allen v. Clark, D.C. Cal.1938, 22 F.Supp. 898.

and are responsible to the plaintiff only in the amount of the several claims upon which that adjudication was based, and as there can be no recovery against them on account of attorney's fees and costs in that suit, and the amount to be recovered here, as appears from the complaint, is necessarily limited to the amount of the original claims, exclusive of interest, the court is without jurisdiction." Opinion, 91 F. at pages 294, 295.

 There is no similarity between the two situations. There, there was a final judgment, and an attempt made to add assigned claims, *unlitigated*, to a claim which had *already been determined*. Therefore, the court said that the litigated claim could not be added to make up the requisite jurisdictional amount. The court did not say that a flexible provision which, either in terms of money or in terms of cost, over a period of years, provided for a *method of liquidating damages*, could not be made the basis of federal jurisdiction. And I know of no case which so holds. I have already read into the record portions of the decision in Hanlon Drydock & Shipbuilding Co. v. G. W. McNear, Inc., 1924, 70 Cal.App. 204, 232 P. 1002, and from the leading case in the United States Courts,—Sun Printing & Publishing Ass'n v. Moore, 1902, 183 U.S. 642, 22 S.Ct. 240, 46 L.Ed. 366. In both, it is held that liquidated damages are permissible if the circumstances surrounding the making of a contract show that it was not practicable to ascertain the damages. And the word "practicable" does not mean practicable to the parties. It means practicable *to a court*.[8]

I do not find anything in the other case on which the defendant relies,—Rice v. Schmid, 1941, 18 Cal.2d 382, 115 P.2d 498, 138 A.L.R. 589, contradictory of this principle. There, the trial court found that, in the particular circumstances, the provision for liquidated damages was not necessary. And rightly. That was an agreement between a wholesale flour merchant and the proprietor of a bakery, whereby the wholesale merchant agreed to sell 6,000 barrels of flour at a given price, $7.10 to $7.65. The contract called for delivery within 60 days. The time was later extended. A portion of the flour was delivered. Delivery was stopped when it reached the total of 3,245 barrels. On December 2, 1938, before the time of final shipment had expired, the defendant refused to furnish any further instructions for delivery of the remainder of the flour.

On December 2, 1928, the plaintiff notified the new proprietors of the Eagle Bakery of his election to terminate the contract and to hold them liable in damages for breach of the contract. The contract contained a provision for liquidated damages, and the plaintiff sought to recover such damages. In a separate count, he also asked for the recovery of the actual damage suffered. The trial judge gave judgment for the plaintiff, but held that

---

[8] The teachings of these cases are recognized, with some variations, not material here, in practically all the States of the Union. See: 25 C.J.S., Damages, §§ 101, 102; Restatement, Contracts, § 339.

And the determinative test of impracticability is this: Is the damage clause a genuine, covenanted pre-estimate of the damage to be suffered? If it is, it will be enforced. Among the federal cases may be cited: United States v. Bethlehem Steel Co., 1907, 205 U.S. 105, 120, 121, 27 S.Ct. 450, 51 L.Ed. 731; Wise v. United States, 1919, 249 U.S. 361, 39 S.Ct. 303, 63 L.Ed. 647; Fidelity & Deposit Co. of Maryland v. Walker et al., 5 Cir., 1935, 75 F.2d 115; Burns Trading Co. v. Welborn, 10 Cir., 1936, 81 F.2d 691, 106 A.L.R. 285; Whiteside v. Rocky Mt. Fuel Co., 10 Cir., 1938, 101 F.2d 765; In re Oscar Nebel Co., Inc., 3 Cir., 1941, 117 F.2d 326, 327.

To the California cases cited in the course of the opinion may be added:

Milk Producers Association v. Webb, 1929, 97 Cal.App. 650, 275 P. 1001; Starr v. Lee, 1928, 88 Cal.App. 344, 263 P. 376.

If the contract of membership be considered a New York contract, then the New York rule must prevail. See: Six Companies v. Joint Highway District No. 13, 1940, 311 U.S. 180, 61 S.Ct. 186, 85 L.Ed. 114; Bradford Electric Light Co. v. Clapper, 1932, 286 U.S. 145, 52 S.Ct. 571, 76 L.Ed. 1026, 82 A.L.R. 696; Lykes Bros. S.S. Co. v. Esteves, 5 Cir., 1937, 89 F.2d 528. But, as the law of New York is the same as the law of California, (Caesar v. Robinson, 1903, 174 N.Y. 492, 67 N.E. 58; Little v. Banks, 1881, 85 N.Y. 258; Curtis v. Van Bergh, 1889, 161 N.Y. 47, 55 N.E. 398; Hackenheimer v. Kurtzmann, 1923, 235 N.Y. 57, 138 N.E. 735), there need be no deviation from what is said in the text and in this note on the basis of California and Federal decisions.

the liquidated damage provision was invalid. He awarded actual damages in the sum of $712.45.

 Here is a product,—*flour*,— which could then be bought and sold in the open market, without restriction as to the quantity or price. And certainly, the damages resulting from the buyer's breach was easily ascertainable. In determining the case, the court quoted sections 1670 and 1671 of the California Civil Code, which read:

Civil Code, Sec. 1670. "Every contract by which the amount of damage to be paid, or other compensation to be made, for a breach of an obligation, is determined in anticipation thereof, is to that extent void, except as expressly provided in the next section."

Civil Code, Section 1671: "The parties to a contract may agree therein upon an amount which shall be presumed to be the amount of damage sustained by a breach thereof, when, from the nature of the case, it would be impracticable or extremely difficult to fix the actual damage."

And this is the way they interpreted them: "Under these code sections a plaintiff, seeking the enforcement of a liquidated damage clause, has the burden of establishing that *at the time the contract* was entered into the nature of the agreement was such that it *would be impracticable or extremely difficult for a court* to fix the actual damage in the event of a breach. * * * It is a question of fact in each instance whether the nature of the case is such that it would be impracticable or extremely difficult to fix the actual damage." Opinion, 18 Cal.2d at page 385, 115 P.2d at page 499, 138 A.L.R. 589.

And then they gave this uncontrovertible reason why it would not be impracticable for a court to fix the damage: The California Civil Code has distinctly fixed the measure of damages for such breach. The court used this language:

"Civil Code, section 1784 (3), which is part of the Uniform Sales Act, provides that where a buyer fails to accept goods for which he has contracted, the 'measure

of damages is, in the absence of special circumstances, showing proximate damage of a greater amount, the difference between the contract price and the market or current price at the time or times when the goods ought to have been accepted * * *'. The trial court found that neither at the time the contract was entered into nor thereafter was it impracticable or extremely difficult to fix the actual damage, and this finding is supported by the record. There was testimony that the particular brands of flour involved in this contract were actually sold and offered for sale at quoted prices each day. From such evidence the court found that there were daily quotations upon these brands of flour and that the market price could be ascertained at any time. Plaintiff relies upon the fact that there was no organized exchange at which daily quotations of flour prices were furnished and also upon the fact that there were no quotations published in the papers. It is not necessary, however, that there be an organized exchange for determining 'market price'. Decisions have indicated that the measure of damages is not too difficult of ascertainment even though dependent upon the price of articles as to which no regular market exists. * * *

"Since the actual damage involved in the breach of this contract could have been estimated in accordance with the established principles, it follows that the situation contemplated in Civil Code, section 1671, was not present and, as held by the trial court, the provision for liquidated damages must be held void under section 1670. * * * A valid liquidated damage clause must, of course, represent a reasonable endeavor by the parties to estimate fair compensation for the loss sustained." Opinion, 18 Cal.2d at pages 385, 386, 115 P.2d at page 499, 138 A.L.R. 589.

Hence its conclusion that the trial court properly refused to enforce the liquidated damage clause and was right in giving judgment for actual damages only. This decision does not detract from the principles I consider as governing liquidated damages.[9]

---

[9] It is significant that all the authorities referred to in the preceding note stress the view that the terms used in the contract are not imperative, when we seek to determine the nature of the damage clause. Although denominated penalties, damage provisions will be held not to be such if the surrounding circumstances warrant. See, especially, 25 C.J. S., Damages, § 104; Hanlon Drydock & Shipbuilding Co. v. G. W. McNear, Inc., 1924, 70 Cal.App. 204, 214, 232 P. 1002; Whiteside v. Rocky Mt. Fuel Co., 10 Cir., 1938, 101 F.2d 765, 768. As said by the

■ Another contention is that the provision for withdrawal is arbitrary and void. On the basis of the evidence in the record, a study of the By-Laws, and of such details of the operation of The Associated Press, and of its agencies, as have been testified to here, I cannot say that, in a membership corporation, a provision which states that any withdrawal must be approved by the board, and, if not so approved, the member may still have the benefit of his contract for a period of two years by continuing to receive service and pay for it, at the end of which period, *automatically*, his withdrawal shall become final, is invalid.[10]

If we assume that this matter is to be determined by the law of California, I can find no invalidity, under the ruling of the Supreme Court in Haynes v. Annandale Golf Club, 1935, 4 Cal.2d 28, 47 P.2d 470, 471, on which the defendant relies. There, the Club had a by-law which stated that a member could not resign unless he made an application in writing, that the resignation was not effective until accepted by the Board of Directors, and that it could not be accepted while the member owed any debts to the corporation, or until he had assigned and delivered his certificate and resignation. The by-law also decreed: "Until the transfer of the certificate of membership on the books of the corporation, or until the date of the expulsion of a member, the record owner of each membership shall be and remain liable for all dues, fees or other charges which have accrued or which may thereafter accrue."

The court grounded its decision, first, on the fact that Sections 653w, 598 and 602 of the California Civil Code clearly contemplated that the by-laws should contain provisions for withdrawal. What they finally held was that, while the directors could refuse to accept a resignation, *for a time,* the by-laws did not give them the right to force *perpetual membership* on a member desiring to resign. And this is the way they put it: "By paying the dues and turning in his certificate, plaintiff did every substantial thing required by the by-law. For defendant to hold him as a *perpetual member* on its mere fancy or caprice would be obnoxious to the spirit as well as to the clear meaning of the statute. The contention that an assignment to a new candidate for membership is required by the by-law is clearly untenable. An endorsement of the certificate and delivery thereof to the club satisfies the provision of the by-law on that subject.

"So much of said by-law as allows defendant to deny the right of resignation on the ground that it has merely withheld its consent or has declined to make the necessary book entries is invalid because

---

Supreme Court in United States v. Bethlehem Steel Co., 1907, 205 U.S. 105, 120, 27 S.Ct. 450, 455, 51 L.Ed. 731: "The word 'penalty' is used in the correspondence, even by the officers of the government, but we think it is evident that the word was not used in the contract nor in the correspondence as indicative of the technical and legal difference between penalty and liquidated damages. It was used simply to provide that the amount named might be deducted if there were a delay in delivery. Either expression is not always conclusive as to the meaning of the parties. Little v. Banks [85 N.Y. 258], supra; Ward v. Hudson River Building Co., 125 N.Y. 230, 26 N.E. 256."

10 New York deals generously with its membership corporations. It allows their creation for any lawful purpose under the Membership Corporations Law. Under Section 40 of Article 3 of this law, Consol. Laws 1909, c. 35, membership corporations may be created, for any lawful purpose, "except a purpose for which a corporation may be created under any other article of this chapter, or any other general law than this chapter." Section 8 of Article 2 of this law provides: "The by-laws of any such corporation may make provisions, *not inconsistent with law* or with its certificate of incorporation, regulating the admission, *voluntary withdrawal,* censor, *suspension* and *expulsion of members.*" (Italics added.)

In interpreting these enactments, the courts of New York have held that the membership application, the Constitution and By-Laws of membership corporations are the contract by which each member is bound. See Belton v. Hatch, 1888, 109 N.Y. 593, 17 N.E. 225, 4 Am.St.Rep. 495; Kennedy v. Local Union, 1902, 75 App.Div. 243, 78 N.Y.S. 85; Haebler v. New York Produce Exchange, 1896, 149 N.Y. 414, 44 N.E. 87; National League of Commission Merchants v. Hornung, 1911, 148 App.Div. 355, 132 N.Y.S. 871; Matthews v. Associated Press, 1893, 136 N.Y. 333, 32 N.E. 981, 32 Am.St.Rep. 741 (in which Judge Peckham, later a member of the Supreme Court, interpreted and held valid one of the by-laws of The Associated Press); Polin v. Kaplan, 1931, 257 N.Y. 277, 282, 177 N.E. 833.

unreasonable and arbitrary". Opinion, 4 Cal.2d at page 30, 47 P.2d at page 471. (Italics added.)

This decision does not spell unreasonableness for the withdrawal clause before us. The directors, through the bylaws, say, in effect, to each member: "We might, if you give us a good reason, allow you to withdraw. If we do not, we will, nevertheless, allow you to apply for withdrawal and your membership will terminate after two years from the date of notice, during which time, by paying such assessments as are levied, from time to time, you are entitled to the service. If you do not pay for the service, we will declare you in default, in which event the damage to us will be your assessments for 104 weeks."[11]

We are not dealing here with an application for withdrawal arbitrarily denied, after the member had done everything required of him under the By-Laws. The defendant's letter of May 16, 1940, to The Associated Press was peremptory. It was almost a command.

"Gentlemen:

"The Oxnard Courier has been merged with the Oxnard Evening Press and we will be unable to use your service after the week ending May 25, 1940.

"This is official notice for you to discontinue all feature service as well as wire service, as of Saturday, May 25, 1940."

Nine days elapsed from the day this letter was written to the date which the defendant decreed for termination. Assuming that it was sent by air mail, we have, at most, a six days' notice. To which the defendant added: "It is also noted that my bank will not honor your draft after that date."

He did not say: "In view of certain circumstances, I hereby apply for withdrawal and ask that it be considered at the next meeting of the Board," in which case they would have the right, when they met in June, to consider it. Instead, he said, in effect: "I am through, Gentlemen, and do not try to draw on me, because I am not going to resume the service, as I do not need it."

It seems to me that the evidence, as it stands now, makes it quite clear that a world-wide organization of the character of The Associated Press, with so large a membership, and which is required to render the service on the basis of assessments to be determined from time to time, is not in a position, by the very nature of its operations, to rely upon a court to fix the damages at the time of the breach of its membership contract. There are too many contingencies,—war and others—which affect the matter, and which must be considered. Its news or feature services are not like flour, because neither can be bought in the market. The main basis of the decision in the Rice case was that flour was a commodity bought and sold in the open market.[12] You cannot buy The Associated Press service in the open market and no court can compel The Associated Press to sell a membership.[13] It is clear to me that there was, in this case, at the time of the

[11] The application for membership (Plaintiff's Exhibit 1) carried, in bold type, at the top, the statement: "Two Years Notice Must Be Given To Withdraw."

[12] Rice v. Schmid, 1941, 18 Cal.2d 382, 115 P.2d 498, 138 A.L.R. 589.

[13] I cannot refer to cases involving The Associated Press. However, there are New York cases which have applied these principles to other membership corporations or voluntary associations. Branagan v. Buckman, Sup. 1910, 67 Misc. 242, 122 N.Y.S. 610, 614, affirmed in 145 App.Div. 950, 130 N.Y.S. 1106; Brannagan v. Buckman, 207 N.Y. 719, 101 N.E. 1095, involved a voluntary association of farmers, organized to provide themselves with a telephone line, each member paying his proportionate share of the expense of construction and operation. One of the members removed from the locality and sold his interest in the association. The purchaser sought to compel the association to grant him the same rights as those enjoyed by his predecessor. The court held that it had no jurisdiction to compel the association to recognize the purchaser, saying: "Such membership is a privilege which the association may accord or withhold at its pleasure, and a court of equity has no jurisdiction to compel the admission of a person not regularly elected, even though, as in the case of a political organization or labor union, the arbitrary rejection of the candidate may prejudice his material interests. 25 Am. & Eng.Enc.Law, 1135; Taylor v. Edson, 4 Cush. (Mass.) 522; McKane v. Adams, 51 Hun 629, 4 N.Y. S. 401, affirmed 123 N.Y. 609, 25 N.E. 1057, 20 Am.St.Rep. 785".

By analogy, the principle has been applied to unincorporated associations, such

application for membership (June 3, 1937), or its acceptance (June 16, 1937), a situation, which made it almost impossible to leave the determination of damages to a court. And that there was warrant for the inclusion by reference to the By-Laws, of a liquidated damage clause[14]. It is true that there is evidence tending to prove damages in a less sum. The object of this proof is to show,—not in prospect, but in retrospect, after the cost had been ascertained over the period,—that there was no unreasonableness in fixing the time limit of 104 weeks for withdrawal, because the damages thus fixed *were not disproportionate* to the damage they might suffer from breach. The evidence was not admissible for any other purpose.[15]

But I go a little further here. The problem of jurisdiction and the question of damages go together. They lead me to a definite conclusion,—namely, that the nature of the case, as shown by the facts, warrants the conclusion that the provision for liquidated damages, whatever it is called, is enforceable. From this, it follows that, when the plaintiff alleged that it was damaged, it was doing so in good faith, relying upon a provision in its by-laws, the validity of which it had the right to assume. And it having so come into this court, even if the court should hold that recovery should be for less or be limited to actual damage, the failure to recover the full amount *would not* defeat recovery. The determination of the right to invoke the District Court's jurisdiction, so far as the amount in controversy is concerned, lies *in the good faith of the plaintiff*.[16] The facts in this case show that, in good faith, The Associated Press claimed as its total damage the liquidated damages agreed to on acceptance of membership. This because, as already stated, the facts are such that the damages would be extremely difficult of ascertainment by a court, in view of the complicated system under which The Associated Press operates.

Two other matters have been brought into the case. Frankly, I do not think that they are issues under the pleadings. But they may, perhaps, relate to jurisdiction. They are: lack of mutuality and arbitrariness. What has already been said should dispose of the problem of arbitrariness.

as labor unions (See: Miller v. Ruehl, Sup.1938, 166 Misc. 479, 2 N.Y.S.2d 394; Shein v. Rose, Sup.1939, 12 N.Y.S.2d 87; Murphy v. Higgins, Sup.1939, 12 N.Y.S.2d 913, affirmed 260 App.Div. 854, 23 N.Y.S.2d 552; Acierno v. North Shore Bus Co., Sup.1939, 173 Misc. 79, 17 N.Y.S.2d 170; and very recently to a voluntary association of musical composers and authors (the well-known AS-CAP): See: Arnstein v. American Soc. of Composers, Authors and Publishers, D.C.N.Y.1939, 29 F.Supp. 388.

The Supreme Court of the United States, in interpreting the By-Laws of The Associated Press, has ruled that through its method of operation, it acquires a proprietary interest in its news, which continues even after publication, and upon which a competitor *cannot* infringe by substantial appropriation. See: International News Service v. Associated Press, 1918, 248 U.S. 215, 237, 242, 39 S.Ct. 68, 63 L.Ed. 211, 2 A.L.R. 293. This proprietary interest or monopolistic right (as some have called it) inures to the benefit of the members of the association and may constitute a good portion of its value to them. Apposite also, in this connection, are the words of Judge Peckham in Matthews v. Associated Press, 1893, 136 N.Y. 333, 32 N.E. 981, 32 Am.St.Rep. 741, as to the benefit resulting to the members from placing restrictions upon their use of the news, of the type now embodied in Sections 4 and 5 of Article VII and in Article VIII, especially Sections 5 and 6.

[14] See cases under Notes 8 and 9.

[15] Sun Printing & Publishing Association v. Moore, 1902, 183 U.S. 642, at pages 673, 674, 22 S.Ct. 240, 46 L.Ed. 366. See my opinion in Byron Jackson Co. v. United States, D.C.Cal.1940, 35 F.Supp. 665, 666, 667.

"The amount is not so extraordinarily disproportionate to the damage which might result from the failure to deliver the carriages as to show that the parties must have intended a penalty, and could not have meant liquidated damages." United States v. Bethlehem Steel Co., 1907, 205 U.S. 105, 121, 27 S.Ct. 450, 456, 51 L.Ed. 731.

[16] Dean Dobie, now a member of the Fourth Circuit Court of Appeals, couches this rule in the following language: *"The amount in controversy in the United States District Court is always to be determined by the value to the plaintiff of the right which he in good faith asserts in his pleading that sets forth the operative facts which constitute his cause of action."* Dobie on Federal Procedure, Sec. 56, p. 133. (Italics his.) And see: St. Paul Mercury Indemnity Co. v. Red Cab Co., 1938, 303 U.S. 283, 58 S.Ct. 586, 82 L.Ed. 845; National Surety Corp. v. City of Excelsior Springs, 8 Cir., 1941, 123 F.2d 573, 576, 577.

Further observations are not amiss. We do not have a clause in the contract making withdrawal arbitrarily unconditional. As I stated before, there are several contingencies under which a member may withdraw. I have already summarized them. However, I refer to Section 7. Significantly, this section is found under Article VII of the By-Laws, and is entitled, "Rights and Privileges of Members". It reads: "By a vote of the majority of the Board of Directors, a member may be permitted to withdraw from membership on payment of all dues, assessments, and other obligations, and, upon surrender and cancellation of such member's certificate of membership and upon such other terms as the Board of Directors may fix. If any member shall apply for permission to withdraw from membership in The Associated Press to the Board of Directors, and the same shall be refused, such member may nevertheless give written notice to the Secretary of intention to withdraw, and two years after the date such last named notice shall have been received, and upon payment of all assessments and other obligations to the date of final expiration of said two years, unless the membership is sooner terminated by a vote of a majority of the Board of Directors as specified herein, the members shall continue to take and publish the news service of the Corporation, and pay assessments in the manner specified in these By-Laws and in all respects comply with these By-Laws, and failure so to do in any particular shall thereupon cause the membership to terminate and the assessments for a period of 104 weeks immediately to become due and payable in one aggregate sum, the computation thereof to be based upon the rate of the weekly assessment in effect at the time of the refusal of the Board of Directors to accept the member's application for permission to withdraw, and the said period of 104 weeks also to be computed from that time. In the event that the member continues to take and publish the news service of the Corporation and pay the assessments therefor after the expiration of such period of 104 weeks, such member shall be deemed to have waived his or its intention to withdraw and the membership shall ipso facto continue with the same force and effect as if no notice of intention to withdraw had been given."

Several contingencies may happen under this section. First, a member may be *permitted* to withdraw by the vote of a majority of the Board of Directors, on paying his dues and surrendering his certificate, and upon such other terms as the Board of Directors may attach to the withdrawal. There was not here an application for termination of membership under this clause. There was a fiat by the defendant that after the 25th of May he would be unable to use the service. He gave notice to discontinue it, coupled with notice that his bank would not honor The Associated Press drafts after that date.

Consider the next contingency. If a member applies for permission to withdraw from membership and is refused, he must give notice immediately that he intends to withdraw, in which event, he will continue to receive the service for a period of two years, when his membership terminates. But here, again, there is a provision that the Board of Directors (I presume, upon good cause appearing to them) may, by a majority vote, terminate his membership sooner, thus waiving the two-year period or a portion of it.

To epitomize: We have first, a direct application which may be granted. Then there is a peremptory withdrawal to which the two-years' continuance attaches. But in this contingency, the directors may shorten the time period.

And, finally, if the member fails to comply with any of these requirements, his failure causes his membership to terminate and cause the assessments for a period of 104 weeks to become due, immediately, in an aggregate sum, according to a stated method of computation. Article IX. The By-Laws even provide for taking a member back into "the fold", despite his past delinquencies. If the member continues to accept the service, after the period of 104 weeks,—assuming that he has taken it during that period, and paid his assessments,—he is reinstated automatically without any ado. So I fail to see any arbitrariness.

[redacted] Mark this: There is no denial of the execution of the contract, or of the continuance of the membership under it. There is no charge of non-performance by The Associated Press. The provisions of the By-Laws are binding on the defendant. In his membership application, which he signed, and which was accepted, he designated a certain person, as his attorney, "for it and in its name and behalf, to sign the roll of members of The Associated Press, and in writing to assent to its Certificate of Incorporation and to its By-Laws, with the same

force and effect as it might do personally". (I assume that the neutral gender is used because of the references to the defendant's newspaper, Oxnard Evening Press.) This was followed by the defendant's acceptance of his responsibilities as defined by the Certificate of Incorporation and the By-Laws, through the execution, by his designated attorney, of Plaintiff's Exhibit 2, which reads: "We, the undersigned, hereby accept our election as members of The Associated Press, upon and subject to all the conditions and limitations provided by the foregoing Certificate of Incorporation and By-Laws of the said Corporation, and we hereby assent to the said Certificate of Incorporation and to the said By-Laws, as the same from time to time may be amended, as therein provided, and agree in all respects to be bound thereby".

Several names are typed in, after this printed portion, among them "Dan W. Emmett, Oxnard Evening Press, Oxnard Daily Evening Press, and Oxnard Advertiser Publishing Company, Oxnard, California".

This is followed by the signature of the defendant's attorney. The date of acceptance is the 14th of June, 1937. From that day to May 16, 1940, for nearly three years, the relationship continued with no complaint against the service. Differences arose between the parties—*not exactly differences*—rather discussions for the elimination of items requested by the defendant. I do not think that the concessions granted to the defendant from time to time indicate that damages from breach were not extremely difficult to ascertain. All they show is that, although the plaintiff could refuse to grant any concessions and to reduce the service, from time to time, requests made for reduction of service, *not by imperious order, but by reasonable appeal*, were granted. We find three letters from The Associated Press dealing with these matters. Under date of January 7, 1938, there is a letter discontinuing certain mats, and two comics, and reducing the assessment by $2 per week. On September 15, 1938, the assessment was decreased from $40.25 to $34.35 a week, because of a change in the TWX wire time from 12 minutes to 8 minutes a day, and for discontinuance of PM feature service mats. On November 3rd, it was lowered again from $34.35 to $33.35 a week, because of the discontinuance of serial text mats. I do not think that this action by The Associated Press indicates that they could fix all the damage on repudiation, without regard to the liquidated damage clause. It may well be that on the defendant's abandonment of the contract, they could have released him from liability, and absorbed the loss, had they chosen to do so. But I do not think that from the mere fact that during the life of the contract, on certain items, they voluntarily discontinued the service and reduced the assessment by the estimated cost of wrapping, mailing, and the like, it necessarily follows that the entire contract was of a character that a court could readily ascertain what the damage was, and disregard the agreement of the parties. We cannot retroject conditions which arose later to the inception of the membership, in order to invalidate the damage clause. Its validity must be determined by the conditions which existed when the membership contract was created.

■ Which brings me to another objection,—the absence of mutuality. Counsel for the defendant says that the By-Laws do not bind The Associated Press to do anything. We revert again to Article VII and examine its sections.

"Section 1. At all meetings of the members of the corporation, each regular member may cast one vote by virtue of his or its membership, and such additional votes as he or it may be entitled to cast as the holder of bonds issued by the corporation. Associate members may attend such meeting, but shall have no voting rights.

"Section 2. Each member shall be entitled, upon compliance with the provisions of the By-Laws, to receive a service of news for the purpose of publication in the newspaper specified in such member's certificate of membership and for that purpose only. The nature and extent of the news service to be so received by the member shall be determined by the Board of Directors, upon the member's admission, and the initial dues or assessment shall be fixed at the same time and by the same authority, subject, however, to change as hereinafter provided in Article IX.

"Section 3. The nature and extent of the news service to any member may be changed from time to time by the Board of Directors; provided that this section must not be construed to give the Board of Directors authority to grant a news service in violation of the right of protest as hereinbefore specified, or to omit the news service to any member except for cause as provided in the By-Laws.

"Section 4. The news service of this Corporation shall be furnished only to the members thereof, or to the newspapers owned by them and specified in their certificates of membership.

"Section 5. A member shall publish the news of The Associated Press only in the newspaper, the language, and the place specified in such member's certificate of membership and shall not permit any other use to be made of the news furnished by the Corporation to the newspaper which such member owns. Only the place specified in the certificate of membership shall appear in the title, name or heading of the newspaper wherein the news of The Associated Press is published."

Then follows a time limit for the receipt and publication of news (Section 6), and the provision as to withdrawal (Section 7), which has already been given in full. Then Section 8: "No news furnished to the corporation by a member shall be supplied by the Corporation to any other member publishing a newspaper within the district which the Board of Directors shall have described in defining the obligations of such member to furnish news to the Corporation."

In sum, the member acquires the right to receive the service defined in his contract. He has the privilege of attending meetings and voting on the acts of The Associated Press, thereby influencing its policy. The Associated Press agrees not to furnish services except to other members of the Association. The member controls the domain which is included in his membership. After he has been a member for five years, he acquires the right to protest the election of new members by the Board (Article III, Section 7). By Article VIII of the By-Laws, each member is required to furnish to The Associated Press, through its agents or employees, all the news of his district. No member is allowed to furnish any news to persons other than members or to furnish the news of The Associated Press in advance of publication. Members are required to give credit, in their newspapers, to The Associated Press or to any newspaper member for news obtained from either source. No member is permitted to anticipate the publication of any documents of public concern, *released by The Associated Press,* for use on a designated date. These restrictions upon the members inure to the benefit of each member. The individual member's proprietary interest in news is protected because other members are held to similar restrictions. If he cannot furnish news to other members or "beat the gun" on dated releases *to his own profit,* neither can the other members do it, *to his detriment.* Each member of The Associated Press carries on the masthead of his or its newspaper the statement:

"Member of the Associated Press

"The Associated Press is exclusively entitled to the use for republication of all news dispatches credited to it or not otherwise credited in this paper and also the local news published herein. All rights of republication of special dispatches are also reserved."

The member acquires the right to use their news without paying for them, after publication. He may take the Los Angeles Times and rewrite a whole story, which bears the A.P. mark. He may take the Bull Dog edition of this metropolitan newspaper, and if he gets it at 7 o'clock in the evening at Oxnard, he may rewrite a good portion of the whole edition and fill his rural newspaper, which does not reach the streets of Oxnard until next day. He is limited only to the place specified.

It follows that he acquires valuable rights when The Associated Press agrees to furnish him the service. They cannot stop the service without cause. Article VII, Section 3. If we adopt the pragmatic saying that "the proof of the pudding is in the eating", the proof of mutuality is not only contained here, but in the fact that, during this entire period, the service was actually furnished without complaint on the part of the defendant. Assuming, therefore, that mutuality enters into the case, we certainly have mutuality here. For a person acquires a valuable right, when the Board of Directors agrees to furnish him the service, and *not to furnish it* to anyone else in the territory. He is thus given the exclusive right, within his territory, of receiving The Associated Press news. And he can veto any attempt by the Board to place another competitor in his territory.[17] If we consider the nature of the Association, there is no arbitrariness. The Associated

---

[17] See Article III, Section 7. The value of this protection to the member is exemplified by International News Service v. Associated Press, 1918; 205 U.S. 215, 39 S.Ct. 68, 63 L.Ed. 211, 2 A.L.R. 293.

Press is not able to place a definite price on the service. If they could, and did, they would be engaged in a commercial, not a beneficial, enterprise. They have to depend on assessments, which must be approximated from time to time. Hence I find no lack of mutuality in this contract, which need be considered either in determining the jurisdictional amount or the validity of the liquidated damage clause.

I hold, therefore, that the evidence, as it stands today, shows that the jurisdictional amount is present; that the By-Laws of The Associated Press, which the defendant signed when he became a member, and by which the relationship between him and the plaintiff was governed for a period of almost three years, and, especially, the provision as to termination of membership, are not arbitrary.

The evidence, as it stands now, warrants the conclusion that the insertion of the liquidated damage clause was warranted by the particular conditions of the case. This, because the nature of the business of the plaintiff and the nature of its relationship with the defendant and other members clearly made it impracticable and extremely difficult for any court to fix the actual damage, in the event of a breach. Which brings the case within the exception codified in Section 1671 of the California Civil Code, if we assume that the case is governed by California law. The conclusion also finds support in New York decisions,[18] and in the federal cases to which I have referred during this discussion.

The motions to dismiss and to abate the action, and each of them, will, therefore, be denied.

### Note By Court.

After the rendition of this opinion, the defendant rested without presenting any additional testimony. The plaintiff also rested. Then the defendant renewed all the motions made, without restating them in detail. He also made a motion for judgment on the ground that the plaintiff had shown no right to relief, and submitted it and the other motions without any additional arguments. Upon the grounds stated in the preceding opinion, the court then entered judgment for the plaintiff for the full amount asked in the complaint. The opinion, therefore, *becomes an opinion on the merits.*

[18] See the New York cases cited in Note 8, the federal cases in the same note, and those in the body of the opinion.